The CITY OF INDIANAPOLIS, et al., Appellants–Defendants,

v.

Nancy Hobbs TAYLOR, Individually and as Administratrix of the Estate of Michael H. Taylor, Jr., Appellee–Plaintiff.

No. 30A04–9612–CV–521.

Court of Appeals of Indiana.

March 30, 1999.

Christopher G. Scanlon, Scott D. Himsel, Baker & Daniels, Indianapolis, Attorneys for Appellants.

John O. Moss, Jr., James R. Recker, II, John O. Moss & Associates, Indianapolis, Attorneys for Appellees.

## OPINION

GARRARD, Judge

### Case Summary

Officers Charles Penniston and Edwin Aurs (collectively, "the Officers") and the City of Indianapolis ("the City")[1] appeal a judgment granted in favor of Nancy Taylor ("Mother"), individually and as the administratrix for the Estate of Michael H. Taylor, Jr. We affirm in part and reverse in part.

### Issues

The City and the Officers present four, multiple-part issues which we restate as follows:

I. Whether the injection of the presumption against suicide into the trial improperly prejudiced the Defendants;

---

1. We shall refer to the City and the Officers as the Defendants.

II. Whether reversible error occurred when the trial court admitted hearsay;

III. Whether the trial court abused its discretion when it denied the Defendants' motion for mistrial after Mother's counsel violated a motion in limine; and,

IV. Whether the award of damages was improper.

### Facts and Procedural History

Michael H. Taylor, Jr. ("Taylor") was confined to the boys school in Terre Haute for approximately one year beginning in March of 1986. In August of 1987, shortly after his release from the boys school, Taylor was charged with car theft and detained at the Marion County Juvenile Center for two weeks. The court scheduled a sentencing hearing regarding the car theft charge for September 28, 1987.

On the afternoon of September 24, 1987, Taylor attempted to steal another car. Upon being discovered around 4:00 p.m. by the car's owner and his coworkers, Taylor fled. At approximately 4:24 p.m., Officer Aurs and another Indianapolis Police Department officer apprehended Taylor. Sixteen year old Taylor was wearing two pairs of socks, hightop tennis shoes, shorts, a tank top shirt, and a cap. Officer Penniston arrived to transport Taylor to the juvenile center. The officers searched Taylor and found a cigarette lighter, a screwdriver, and a key chain, but no firearm. The officers then handcuffed Taylor's hands behind his back, and placed him in Officer Penniston's police car.

At some point between the time he entered the police car and his arrival at the juvenile center, Taylor sustained a mortal gunshot wound to his right temple. Officer Penniston radioed for medical assistance and backup officers at 5:04 p.m. Various officers responded as did emergency medical technicians ("EMTs"). The EMTs performed CPR and other emergency procedures on Taylor until paramedics arrived and rushed Taylor to a hospital. Taylor was pronounced dead at the hospital on September 25, 1987.

Believing that Taylor's wound was not self-inflicted, Mother filed this action against the Defendants in Marion Superior Court on August 31, 1989. Specifically, Mother pursued claims against the Defendants under Indiana Code Section 34-1-1-2, Indiana's adult wrongful death statute ("Claim 1"), and under Indiana Code Section 34-1-1-8, Indiana's child wrongful death statute ("Claim 2"). Mother sought recovery against only the Officers under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution, alleging unreasonable force in arresting Taylor ("Claim 3"), and under 42 U.S.C. § 1983 and the Fourteenth Amendment to the United States Constitution, alleging severance of the parental relationship between Taylor and Mother ("Claim 4").

Venue was changed to the Hancock Superior Court where a jury trial commenced on February 12, 1996. Mother prevailed on all four claims. On March 21, 1996, the trial court entered a judgment awarding $957,-421.00 to the Estate and against the Defendants on Claim I, $257,120.00 to Mother and against the Defendants on Claim 2, $1,072,-301.00 plus $500,00.00 punitives to the Estate and against the Officers on Claim 3, and $250,000.00 plus $500,000.00 punitives to Mother and against the Officers on Claim 4. The Defendants filed a motion to correct error, alleging that the award was excessive. The trial court granted the motion in part, reducing the $957,421.00 award for Claim 1 to $300,000.00 ($3,928.90 of which was for funeral expenses) pursuant to Indiana Code Section 34-4-16.5-4.

### Discussion and Decision

#### I. Presumption Against Suicide

The Defendants argue that the trial judge and Mother's counsel erroneously informed the jury that the law presumed against suicide. They claim that the presumption does not apply where, as here, the jury had to choose between two forms of morally reprehensible conduct: suicide and murder. They assert that they were prejudiced by the injection of the presumption against suicide into the trial.

 There is a presumption of law against suicide. *Prudential Ins. Co. of*

*America v. Dolan*, 46 Ind.App. 40, 91 N.E. 970 (1910). That is, when the dead body of the assured is "found under such circumstances and with such injuries that the death may have resulted from negligence, accident, or suicide, the presumption is against suicide, as contrary to the general conduct of mankind—a gross moral turpitude not to be presumed in a sane man; and whether it was one or the other, if there is any evidence bearing upon the point, it is for the jury, as for instance, whether the taking of an overdose ... was intentional or by mistake." *Equitable Life Ins. Co. of Iowa v. Hebert*, 37 Ind.App. 373, 76 N.E. 1023, 1024 (1906) (citing 1 May on Insurance (4th Ed.) § 325). However, the presumption of law against suicide is a rebuttable one. *State Farm Mut. Auto. Ins. Co. v. Shuman*, 175 Ind.App. 186, 370 N.E.2d 941, 954 (1977). Moreover, the presumption against suicide is not evidence and cannot be treated as evidence by the jury in reaching a verdict, and an instruction that such presumption has the effect of affirmative evidence is erroneous. *Prudential*, 91 N.E. at 971.

In *Modern Woodmen of America v. Craiger*, 175 Ind. 30, 92 N.E. 113 (1910), the following instruction was challenged:

The court instructs you that, owing to the instinctive love of life, the presumption is against suicide, and the burden is therefore upon the party asserting death in such manner to establish the fact, and the evidence must be of such character as to exclude with reasonable certainty every other hypothesis than that of death by suicide.

*Id.* at 114. Finding the instruction manifestly unreasonable, our supreme court explained:

[I]n the opening clause, [the lower court] in effect declares that a presumption of law against suicide exists under all circumstances, and therefore the burden of proving self-destruction is cast upon the party relying on that fact, thus confusing matters of pleading and proof. The defense founded upon suicide was affirmative in character, and must be specially pleaded, and hence under the general rules of practice appellant assumed the burden of the issue,

without reference to any presumption of law on the question.

*Id.* They further stated:

It is true that death by suicide is unnatural, and it is not inaccurate to say negatively that the law will not presume an unexplained death to have been suicidal, as it will not presume the existence of fraud, bad faith or dishonest conduct. In determining the charge of suicide, the jury may properly consider the facts and circumstances bearing upon that question given in evidence, in the light of their common knowledge and experience that mankind instinctively love life and generally shun death, although occasionally men, both sane and insane, take their own lives. The cause of death was directly in issue in this case, to be decided not by a presumption of law, but as an inference of fact by the jury in the same manner as other facts are determined in civil actions.

*Id.*

■ As should be evident from the above discussion, the proper application of the presumption against suicide often presents a perplexing task. From our review of the case law, we conclude that the presumption against suicide should not be applied universally. Rather, it should be applied only in cases where one must make a choice between suicide, which has traditionally been viewed in a negative light (like fraud, bad faith, or dishonest conduct), and less culpable conduct, such as an accident. Therefore, while the application of the presumption against suicide in the myriad of insurance cases is proper, the same cannot be said in cases where the choice is between two negative forms of conduct. In those cases, we are persuaded by the logic of *People v. Miller*, 357 N.Y. 54, 177 N.E. 306, 308 (Ct.App.N.Y.1931) that no presumption should apply.

In *Miller*, a murder case, a judge instructed a jury that they were to approach the consideration of the evidence with a presumption that the victim had committed suicide and had not come to her death at the hands of the defendant. *Id.* at 308. Chief Judge Benjamin Cardozo had the following to say regarding the instruction:

It is a ruling in [the defendant's] favor. It has support in the decision of this court in *People v. Creasy*, 236 N.Y. 205, 140 N.E. 563. Upon reconsideration of the doctrine of that case, we are unanimously of the opinion that to the extent of its recognition of a presumption of suicide it should now be disapproved. There is indeed a presumption in the absence of inculpatory evidence that death was not caused by the criminal act of the defendant for this is merely a restatement in another form of the presumption of innocence. There is no presumption that it was caused in any particular way, whether by suicide, by the defendant himself through innocent misadventure, or by the act of some one else, undetected or unknown.

*Id.* at 308–09. Instead, traditional notions of burdens of proof should guide how the jury views the evidence.

 Rather than presenting a question of whether a death occurred by accident or by suicide, the case at bar concerned whether Taylor was killed by the police officers or whether he killed himself. Since both scenarios can be described as reprehensible, the presumption against suicide should not have been applied. Unfortunately, the presumption did arise on more than one occasion.

During voir dire, when asked what he had heard previously about the case, one of the jurors replied: "Basically that [Taylor] was in the back of a police car and somehow shot himself or was shot." Record at 1274. The following discussion then transpired:

[Mother's counsel]: Do you think it's a fair law that you'd be willing to follow that a person who is alive is presumed not to commit suicide, not to take their own [life]?

[Juror]: I'm sorry, would you repeat that?

[Mother's counsel]: Sure. Put it another way, if the Judge instructed you that under the law (inaudible) if the Defendant, the City of Indianapolis and police officers are defending this case on the grounds that the—Mike Taylor, Jr. took his own [life] that [they'd] have to prove that?

[Juror]: Yeah, I could assume that.

[Mother's counsel]: In other words that Mike Taylor does not have to prove that he didn't take his [life].

[Juror]: Right.

[Mother's counsel]: That if the City claims he took his [life] then it'd be the City's job to prove it. Do you think that's fair?

[Juror]: Yes.

[Mother's counsel]: Now that I said earlier, do you think it's a reasonable legal presumption that people who are alive such as yourself and myself are presumed not to take their own life?

[Defense counsel]: Your honor, can I make an objection, may we approach the bench for a minute?

[The Court]: Sure.

[The following sidebar was held outside the presence of the jury].

[Defense counsel]: Your honor, my objection is I don't believe that correctly states the law. I think the jury is getting the wrong impression. [Mother's counsel must] still prove his case. If there is a presumption of suicide there's (inaudible) of going forward and not of proof and the proof that he intentionally killed him still goes back to [Mother's counsel] and the way he keeps talking about this it's as if there is a presumption that we have to prove he committed suicide. I don't think that's what the law says. I still think the burden is on them to prove that we intentionally shot him or negligently shot him or whatever. I think that's a mis-statement of the law and the law is going to be confusing enough here if we start the jury out wrong. I'm concerned that [they're] going to be carrying this through. We're talking about presumptions because the jury will not be instructed in terms of that it's their decision on the presumption. That is legal matter for the Court is to how that goes and the Court will give instructions on burdens of proof based on *State Farm vs. Schuman* [*Shuman*] [175 Ind. App. 186, 370 N.E.2d 941 (1977)].

[Mother's counsel]: I don't see that we've said anything that is objectionable. We said (inaudible) anyone who uses suicide as a defense must prove their case. They come in, use contributory negligence as a

defense you must [prove] contributory negligence. Any affirmative defense that is asserted must be proved by the person who is asserting it, that's all I'm saying.

[The Court]: That's certainly true as a general statement. Then I think I would tend to agree that there's generally speaking a presumption that people do not commit suicide.

[Defense counsel]: I don't believe it's a[n] affirmative defense.

[The Court]: I don't think I have to worry about it affirmative defenses right now. What we're talking about here is a general presumption.

[Defense counsel]: I agree Judge, but the statement has been made to this jury in words to the effect that the Judge will instruct you that it is the Defendant's burden to prove to you that he did not commit suicide and that is not an accurate statement.

* * *

Then I suppose we would request an admonition to the jury at this point that statements made by counsel in voir dire are only that and only the court will instruct the jury as to what the accurate statement of the law is.

[Mother's counsel]: I don't see that the jury need to be instructed on anything. We're just talking about (inaudible)—

[The Court]: Okay, the objection is overruled and the request for admonition is denied.

Record at 1274–77.

In closing arguments, the presumption came up again as follows:

[Mother's counsel]: The law presumes that there are several legal presumptions . . . one of the presumptions is . . . there is a presumption in the law against suicide.

[Defense counsel]: Your honor, we object—there is no instruction on that issue and there is no such presumption.

[The Court]: Your objection is overruled—there is no instruction on it—it is true but it does not mean that the presumption is not in existence. The presumption is one which is rebuttable and it's a matter of evidence.

[Mother's counsel]: It's presumption in law—that a person will not commit suicide—will not commit suicide—along with that presumption is that people desire to continue to live and that they won't take their lives. So part of the defense, as I understand it—Michael's contributor[il]y negligent because they say he took his own life so we start with the legal presumption that a person will not take his life and that presumption stands that Michael didn't take his life and he died by some other means.

Record at 5349–50. After the Defendants gave their final argument, Mother's counsel stated in final argument:

The instruction is going to be that if the Defendants are claiming that Michael was contributor[il]y negligent in that Michael killed himself they got to prove it. They got to prove it. They got to prove their contributory negligence claim. And there is no testimony here that is sufficient to justify that kind of finding in view of everything we know about the physical evidence. . . . And—and you'll see on an instruction, contributory negligence—and the instruction reads, the Defendants have the burden of proof by a preponderance of the evidence that Michael Taylor was contributor[il]y negligent, and what they're talking about when they use the word contributor[il]y negligent here is that Michael took his life. They got to prove that. If they don't prove that then the presumption against suicide continues to prevail. That there is a legal presumption that man does not take his own life.

* * *

We think that [the Defendants] have not, that's their job, they have not proved by a preponderance of the evidence that Michael Taylor killed himself. They just haven't done it. No guess work, no speculation, they just haven't done it. To[o] many opportunities so they have no[t] overcome that presumption. That person does not—voluntarily take their lives. So don't let anything leave you to tamper with reality

and certainty, to tamper with the truth and—we trust in your deliberations and we trust that you'll do the right thing in your deliberations.

Record at 5483, 5491.

While we are troubled that the presumption against suicide was injected into this case, we understand the confusion and do not conclude that reversible error resulted. We reach this conclusion for two reasons. First, unlike many of the other presumption against suicide cases, there was no instruction indicating that the presumption could be treated as evidence by the jury in reaching a verdict. *Cf. Miller*, 257 N.Y. 54, 177 N.E. 306; *State v. Peterson*, 145 Me. 279, 75 A.2d 368 (Me.1950). In fact, none of the instructions mentioned the presumption against suicide. To the contrary, the jury in the present case was instructed:

> In deciding this case you must determine the facts from a consideration of all the evidence in light of the law as contained in these instructions. All the law in this case is not embodied in any single instruction. Therefore, you must consider these instructions as a whole and construe them in harmony with each other.

Record at 5493.

> The unsworn statements or comments of counsel on either side of the case should not be considered as evidence in the case. It is you[r] duty to determine the facts from the testimony and evidence admitted by the Court and given in your presence, and you should disregard any and all information that you may derive from any other source.

Record at 5496.

> To establish a claim for negligence against the ... Officers ..., Plaintiffs may—must prove, (1) Penniston and/or Aurs were negligent with respect to their conduct toward Michael Taylor and (2) that Penniston's and/or Aurs' negligence proximately caused Michael Taylor's death. To establish a claim of—for negligence against the ... City ... Plaintiffs must prove, [the same two prongs as above] and (3) that Officer Penniston's and/or Aurs' negligence, if any, occurred while Officer Penniston and/or Aurs was in the—was or were

in the course and scope of his or their employment with the City ... as police officers.

Record at 5509.

> The Defendant, and each of them, had a duty to exercise reasonable care in protecting and securing the safety of Michael Taylor, Jr. If you find that either individual Defendant breached his duty to exercise reasonable care in protecting the safety of Michael Taylor, Jr. and that said breach of duty was the proximate cause of the injuries suffered by Michael Taylor, Jr. you must find for the Plaintiffs and against the individual Defendant and the City of Indianapolis.

Record at 5511.

> The question of contributory negligence on the part of Michael Taylor is an issue in this case. If Michael Taylor's negligence proximately contributed to his death, then the Plaintiffs in this case cannot recover even though the Defendants may have been negligent. The Defendants have the burden of proving by a preponderance of the evidence that Michael Taylor was contributorily negligent.

Record at 5512.

> Contributory negligence is the failure of a Plaintiff, or in this case the failure of Michael Taylor, to use reasonable care to avoid death to himself, which failure is a proximate cause of the injuries for which the Plaintiffs in this case seek to recover. You are instructed that if you find that Michael Taylor died of a self-inflicted gun shot wound then Michael Taylor's conduct is considered contributory negligence as a matter of law. Therefore, if you find that Michael Taylor died of a self-inflicted gun shot wound then you must find for the Defendants and against the Plaintiffs Estate of Michael Taylor and Nancy Taylor on their negligence claims.

Record at 5513.

In addition, the jury received instructions regarding the elements necessary to prove the federal claims. Record at 5519–26. Therefore, the jury received correct instructions regarding the burdens in this case.

Second, the few references to the presumption against suicide occurred during a trial that lasted over a month and produced a transcript containing more than 4500 pages. We are not inclined to assume the jury clung blindly to the presumption against suicide under such circumstances. The Defendants have not shown prejudice.

## II. Hearsay

Our examination of the hearsay issue requires the following background information. Ollie Jelks was an Indianapolis fire fighter and EMT. During 1987, Jelks lived on the same cul-de-sac as Dean whose husband was also a firefighter. Dean testified that on September 25, 1987, she had a conversation with Jelks in her van in the fire station parking lot after he had assisted at the juvenile center. According to Dean, Jelks was "very disturbed and upset," "very shook up," anxious, and he wanted a drink immediately. Record at 3677, 3683. Jelks was upset because as the first to respond to the call, he was in the car with Taylor. He knew that the position in which he found Taylor's body was not the same as he was told to state to the detectives when they came. Record at 3697. Further, Jelks apparently told Dean that the gun was in a different place from where he was told to say the gun was. Record at 3697–98. Jelks returned to the station.

While waiting in her van, Dean saw police officers arrive at the fire station and observed through a window of the fire station several firemen conversing with men in business suits. At some point, Jelks returned to her van and she and Jelks spoke again. Dean testified that a police officer had stated to Jelks, "[Taylor] was nothing but a fuckin' punk and the n----r got what he deserved." Record at 3701. According to Dean, Jelks relayed the following account of the incident which an officer had told him. Taylor was "being a bit of a smart mouth and saying things disrespectfully to the cop—to the officers—uh—they had an argument and—he said that the Officer told him that he shot"

Taylor. Record at 3720. As a result, Jelks did not believe that Taylor had committed suicide. *Id.*

The Defendants do not challenge the admission of Dean's testimony that Jelks stated the gun and Taylor's body were not in the same position as he was told to state to the detectives when they came.[2] Rather, the Defendants contend that Dean's testimony, that Jelks told her an officer used the racial epithet and that an officer confessed to having shot Taylor, was double hearsay. They assert that the trial court erred in admitting the testimony because it originated from an unnamed declarant and Mother provided no non-hearsay evidence that a defendant made the statements. The Defendants further claim the admission of the hearsay prejudiced them.

The Indiana Rules of Evidence define hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ind. Evidence Rule 801(c). Hearsay rests on the credibility of an out-of-court declarant who is unavailable for cross-examination, and therefore is generally not admissible in evidence. *Owensby v. Lepper,* 666 N.E.2d 1251, 1255 (Ind.Ct.App.1996); Ind. Evidence Rule 802. However, errors in the admission of evidence, including hearsay, are to be disregarded as harmless unless they affect the substantial rights of a party. *See McClain v. State,* 675 N.E.2d 329, 331 (Ind.1996). In determining whether an evidentiary ruling has affected an appellant's substantial rights, we assess the probable impact of the evidence on the jury. *See id.* Admission of hearsay is not grounds for reversal where it is merely cumulative of other evidence admitted. *See id.* at 331–32.

Double hearsay, also known as hearsay included within hearsay, or multiple hearsay, "is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule provided in these rules." Ind. Evidence Rule 805; *see also Mayberry v. State,* 670 N.E.2d

---

**2.** Such testimony was clearly admissible under the excited utterance exception to the hearsay rule. *See* Ind. Evidence Rule 803(2); *see also*

*Montgomery v. State,* 694 N.E.2d 1137, 1141 (Ind.1998).

1262, 1267 (Ind.1996). Thus, in determining whether the trial court abused its discretion in admitting the testimony, we engage in a multiple-part inquiry. We examine whether the various parts of the challenged testimony are indeed hearsay. If they are not hearsay, then we address the probative value-versus-prejudice question. If hearsay was present, we analyze whether each piece of hearsay conforms with an exception to the hearsay rule.

■ Jelks' statement that an officer told him "[Taylor] was nothing but a fuckin' punk and the n----r got what he deserved" was not hearsay. The statement was not offered in evidence to prove the truth of the matter asserted. Specifically, Mother's counsel would not have offered it to show that Taylor was actually a "punk" or that he deserved to die. Instead, it was offered to show the attitude of the police and/or a possible motivation for the police to have shot Taylor.

■ If a statement is offered for a purpose other than to prove the fact asserted therein (a non-hearsay purpose), it is admissible if it is relevant and if the danger of unfair prejudice does not substantially outweigh its probative value. *Hall v. State,* 634 N.E.2d 837, 843 (Ind.Ct.App.1994). Undoubtedly, the statement was relevant since the central issue of the case was the cause of Taylor's death. The statement, which contains a racial epithet, is also prejudicial, but not unfairly so in view of the other evidence presented in the case. Under the circumstances, we cannot say the danger of prejudice outweighed the probative value of the statement. *See Tompkins v. State,* 669 N.E.2d 394, 397 (Ind.1996).

■ Dean's statement, that Jelks told her that an officer told him the racial epithet, was hearsay. That is, it was offered in evidence to prove that Jelks actually told her about the racial epithet. Thus, we analyze whether it falls within a hearsay exception. Hearsay is admissible under the excited utterance rule when the statement relates "to a startling event or condition while the declarant was under the stress of excitement caused by the event or condition." Ind. Evidence Rule 803(2). The amount of time that

has passed between the event and the statement is not dispositive. *Yamobi v. State,* 672 N.E.2d 1344, 1346 (Ind.1996). The issue is whether the declarant was still under the stress of excitement caused by the startling event when the statement was made. *Taylor v. State,* 697 N.E.2d 51, 52 (Ind.1998). Application of the criteria is not mechanical. Rather, under Rule 803(2), like its predecessor common-law doctrine, the heart of the inquiry is whether the statement is inherently reliable because the declarant was incapable of thoughtful reflection. *Montgomery v. State,* 694 N.E.2d 1137, 1141 (Ind.1998).

> For the excited utterance exception to apply, the declarant must have personally witnessed the event about which he speaks. However, there does not have to be direct evidence of the personal observation. Instead, the personal observation can be proven by circumstantial evidence. So long as it can be inferred that the declarant personally observed the event, and there is nothing to make the inference that he did not observe the event more probable, it is sufficient.

*Carter v. State,* 683 N.E.2d 631, 632 (Ind.Ct.App.1997) (citations omitted), *trans. denied.*

■ A perception that police had just shot a teenager and that they wanted Jelks to lie about the circumstances of Taylor's demise understandably unnerved Jelks and likely made him incapable of thoughtful reflection. The startling effect of such a trauma could continue for quite some time. Indeed, Dean's testimony of Jelks' excited condition supports the notion that he was still under the stress of the events. That she did not use the exact word "excited" to describe Jelks is of no moment. Further, Jelks' presence at the juvenile center and his statement concerning the conversation with the officer lead to an inference that Jelks did actually speak to the officer. As such, we agree that Dean's testimony, that Jelks told her of the racial epithet, was inherently reliable and thus admissible as an excited utterance.

Jelks' statement, that an officer told him that Taylor was "being a bit of a smart mouth and saying things disrespectfully to the cop—to the officers—uh—they had an

argument and ... the Officer told [Jelks] that he shot" Taylor, appears at first to be hearsay. Mother's counsel certainly offered it to show the truth of the matter asserted, that is, that an officer shot Taylor due to his disrespectful manner. However, Mother argues that the statement is properly classified as "not hearsay" under Evidence Rule 801(d)(2)(A), (D).

A statement is not hearsay if the "statement is offered against a party and is (A) the party's own statement, in either an individual or representative capacity; or ... (D) a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship[.]" Ind. Evidence Rule 801(d)(2); *see also Hirsch v. State*, 697 N.E.2d 37, 41 n. 9 (Ind.1998); *Hicks v. State*, 690 N.E.2d 215, 221 n. 11 (Ind.1997).

 Here, one could reasonably infer that the declarant of the confession was either Penniston or one of the other police officers at the juvenile center.[3] If it was Penniston, as it could have been since the declarant was described as the arresting officer, then the statement was not hearsay because it was a statement by a party opponent. If the declarant was another police officer who arrived at the juvenile center, then the confession was not hearsay. Rather, it was a statement by the City's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship. Since the confession was not hearsay, we need not address whether exceptions to the hearsay rule permitted its admission.

As for the Evidence Rule 403 balance issue, the confession was certainly relevant. Likewise the confession was prejudicial. However, considering the evidence in the Defendants' favor, we cannot say the danger of unfair prejudice outweighed the probative value of the statement.

 Dean's statement, that Jelks relayed to her the officer's admission that he shot Taylor, was hearsay. That is, it was offered

in evidence to prove that Jelks actually told her of the officer's confession. Like Jelks' statement to Dean regarding the racial epithet, Dean's statement that Jelks told her of the officer's confession was admissible as an excited utterance because Jelks was still in an excited state over the events surrounding Taylor's death.

In summary, we cannot say the trial judge abused his discretion when he admitted the challenged testimony as it was neither inadmissible hearsay nor unfairly prejudicial.

### III. Mistrial

The facts surrounding the mistrial issue are as follows. The parties filed motions in limine and the trial court ruled in relevant part:

> The motion is sustained in its entirety with regard to evidence concerning the criminal or juvenile history of Michael Taylor and all other witnesses except for evidence of the commission of crimes admissible for the purpose of impeachment of the witness consistent with the rule announced by *Ashton v. Anderson* and its progeny as incorporated into the Indiana Rules of Evidence.

> \* \* \*

> The motion is sustained with regard to evidence of or reference to other lawsuits or complaints against Defendant or its employees or Defendant's internal investigations of or discipline against its employees.

> \* \* \*

> The motion is sustained with regard to evidence of disciplinary action or investigations of individual defendants contained in such defendants['] personnel files.

Supp. Record at 2, 3.

Despite the order in limine, Mother's counsel asked Aurs during trial: "Have you always been a patrolman?" Record at 1880. Just as Aurs responded in the negative, defense counsel objected. Counsel then approached the bench and the defense request-

---

**3.** There is no indication from Dean's testimony that the person who made the confession to Jelks

was a civilian rather than a police officer.

ed a mistrial, asserting a violation of the limine order. The trial judge then excused the jury and discussion of the matter ensued. The trial court denied the motion for mistrial, explaining:

> I'm assuming that you have done what you · need to do which is to advise not only your witnesses but those who we could say are—somehow aligned with your sides of the case of the requirements of the Orders in Limine. I would have expect[ed] that you would have done that. Therefore, I would expect this witness would answer the question that was posed without stepping over the line. [Mother's counsel] is dangerously close to the line. But that's part of the art of being a lawyer. There's no evidence in this record of what the rank structure is in this Police Department and I don't anticipate that there's likely to be. I don't see this as a violation. I see [that] it's close. I don't want the Order to be violated. I don't think anybody here should seriously want to risk a mis-trial.

Record at 1885. After further extensive discussion, the jury was called back and asked whether they had heard the answer to the last question. When most of the jurors responded that they neither heard the answer nor remembered the question, the judge stated: "In substance the last question was, have you always been a patrolman. You may answer." Record at 1901. Again, Aurs answered in the negative.

The direct examination of Aurs continued uneventfully with several more questions asked and answered until Mother's counsel asked: "Were you later disciplined in connection with the search you conducted on Michael Taylor?" Record at 1909. Before Aurs had a chance to respond, defense counsel objected. During a sidebar, defense counsel alleged a violation of the limine order, and then requested a mistrial, a dismissal of the negligence counts, or an admonishment. After a lengthy debate, the trial judge stated:

> It seems to me that we have two (2) choices at this point. Basically I'm going to have to decide—I mean, one thing['']s clear, [Mother's counsel's] question is a violation of the Order. Now,—the next step I'm going to have to decide is should I grant relief by—if I find that granting relief from the Order with regard to this question is appropriate then it's going to be no harm no foul.... But, if I don't think that he's entitled to relief then I have to decide whether to grant the motion for mis-trial, whether to grant the motion for partial dismissal,—or whether or not to deny both—and whether or not I should sanction in some way for the violation.... My inclination is to simply bring the jurors back, preliminarily sustain your objection, tell them to disregard the question and that the Court has previously ruled and such matters are not relevant to this proceeding, let you question ..., recess and in the mean time hold these motions under advisement and see what I decide over the weekend.

Record at 1919. In keeping with his plan, the trial judge brought in the jury and stated: "The objection to the pending question is sustained. The Court has previously determined evidence with respect to what was asked in that question is not currently admissible in the case." Record at 1921. The court did not change its mind over the weekend. Record at 2026. It is this denial of a mistrial motion which Defendants appeal.

We recently set out our standard of review on appeals from mistrial decisions:

> The trial court's determination of whether to grant a mistrial is afforded great deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury. To prevail on appeal from the denial of a motion for mistrial, the appellant must demonstrate the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. However, mistrial is an extreme remedy invoked only when no other measure can rectify the perilous situation. We determine the gravity of the peril based upon the probable persuasive effect of the misconduct on the jury's decision rather than upon the degree of impropriety of the conduct. Moreover, reversible error is seldom found

when the trial court had admonished the jury to disregard a statement made during the proceedings.

*Kavanaugh v. State,* 695 N.E.2d 629, 632 (Ind.Ct.App.1998) (citing *Bradley v. State,* 649 N.E.2d 100, 107–08 (Ind.1995)).

The Defendants make much of the fact that despite the motion in limine and the judge's earlier comments about Mother's counsel stepping "close to the line," Mother's counsel asked whether Aurs was disciplined in connection with his search of Taylor. While we do not condone Mother's counsel's action if he deliberately disobeyed the limine order,[4] in analyzing the issue of grave peril, the degree of impropriety of counsel is not determinative. Instead, we focus on the probable persuasive effect of the misconduct on the jury's decision.

■ Here, Aurs did not answer the question. Moreover, the jury was properly admonished that any information solicited by the question was not admissible. *Null v. State,* 690 N.E.2d 758, 762 (Ind.Ct.App.1998) ("A timely accurate admonition is presumed to cure any error in the admission of evidence."). Further, the jurors were instructed that counsel's questions are not evidence. Record at 5496.[5] We also note that this was one unanswered question during a very long trial at which several volumes of evidence was presented. Accordingly, we conclude that the probable persuasive effect of the misconduct on the jury's decision was low. The trial court did not err in denying the motion for mistrial.

## IV. Damages

The Defendants make various challenges to the award of damages. They argue that the judgment is excessive because damages were awarded under both the adult wrongful death statute and the child wrongful death statute. Further, they question the determination that Mother was dependent upon Taylor. In addition, they contend that damages should not have been awarded for the same injury under both state and federal law.

Mother asserts that the Defendants have waived their challenges to the damages. She claims that the Defendants' objection to instruction number 17 was not specific enough to preserve the issue of whether Mother could recover under both the adult and the child wrongful death statutes. She also points out that the Defendants tendered no instruction regarding the proper assessment of damages or the interrelationship between the adult and the child wrongful death statutes. As such, she states that the Defendants have not shown plain error. However, even applying the plain error doctrine, we conclude that the Defendants' arguments have some merit.

■ Actions for wrongful death are purely statutory as, at common law, there was no liability in tort for killing another because actions for personal injury did not survive the death of the injured party. *Estate of Miller v. City of Hammond,* 691 N.E.2d 1310, 1312 (Ind.Ct.App.1998), *trans. denied.* Because a wrongful death action is in derogation of the common law, the statutes creating the cause must be strictly construed, permitting recovery of only those damages specifically prescribed. *Ed Wiersma Trucking Co. v. Pfaff,* 643 N.E.2d 909, 911 (Ind.Ct.App. 1994), opinion adopted by 678 N.E.2d 110 (Ind.1997).

■ The relevant version of Indiana's child wrongful death statute provides:

(a) As used in this section, *"child" means an unmarried individual without dependents* who is:

(1) less than twenty (20) years of age; . . .

(b) An action may be maintained under this section against the person whose wrongful act or omission caused the injury or death of a child. The action may be maintained by:

(1) the father and mother jointly, or either of them by naming the other parent as a

---

4. From the discussion in the record, it is arguable that Mother's counsel may have misunderstood the extent of the limine order.

5. See full text of instruction in Issue I of this opinion, *supra.*

codefendant to answer as to his or her interest . . .

IND.CODE § 34–1–1–8 (emphasis added).[6]

Indiana's adult wrongful death statute provides in relevant part:

When the death of one is caused by the wrongful act or omission of another, the action shall be commenced by the personal representative of the decedent within two (2) years, and the damages shall be in such an amount as may be determined by the court or jury, including, but not limited to, reasonable medical, hospital, funeral and burial expenses, and lost earnings of such deceased person resulting from said wrongful act or omission. That part of the damages which is recovered for reasonable medical, hospital, funeral and burial expense shall inure to the exclusive benefit of the decedent's estate for the payment thereof. The remainder of the damages, if any, shall subject to the provisions of this article, inure to the exclusive benefit of the widow or widower, as the case may be, and to the dependent children, if any, or *dependent next of kin*, to be distributed in the same manner as the personal property of the deceased.

IND.CODE § 34–1–1–2 (emphasis added).[7]

A strict construction of the two statutes leads to the conclusion that recovery under both is not permissible. That is, under the child statute, a parent can only recover if the deceased is a child with no dependents. Under the adult statute, a parent can only recover if he or she is a dependent next of kin of the deceased. If the parent is a dependent next of kin, then recovery is proper under the adult statute, but precluded under the child statute since a "child" must have no dependents. Likewise, if a child has no dependents, then a parent may recover under the child statute, but not under the adult statute.[8] Indeed, we have stated, "we feel the law is obvious that [a mother] cannot recover as a parent *and* an administratrix.

The remedies provided by Ind.Code 1971, 34–1–1–8 (Burns Code Ed.) and Ind.Code 1971, 34–1–1–2 (Burns Code Ed.) are alternative remedies." *Kinslow v. Cook,* 165 Ind. App. 623, 333 N.E.2d 819, 821 n. 2 (1975) (citing *Mayhew v. Burns,* 103 Ind. 328, 2 N.E. 793 (1885); *Hahn v. Moore,* 127 Ind. App. 149, 133 N.E.2d 900 (1956)). Similarly, Chief Judge Swygert stated:

The Indiana Wrongful Death Act and the Indiana statute allowing recovery by a parent for the loss of services of a child create independent and mutually exclusive actions. They neither afford optionally alternative remedies nor are they actions that can be pursued together.

In the case at bar the action had been brought by the father of the deceased child under the provisions of § 2–217. Perforce, there can be no recovery for dependent next of kin under the provisions of § 2–404.

*Vera Cruz v. Chesapeake & Ohio Railway Co.,* 192 F.Supp. 958, 958 (N.D.Ind.1961) (citations omitted).

As applied to the present case, Mother should not have been allowed to recover under both the child and the adult wrongful death statutes. Either Taylor had no dependents and Mother could recover under the child statute, but not the adult statute, or Mother was a dependent next of kin to Taylor in which case recovery under the adult statute, but not the child statute, was appropriate. This conclusion requires that we examine the question of dependency.

As we noted in *Wolf v. Boren,* 685 N.E.2d 86 (Ind.Ct.App.1997), *trans. denied,* our supreme court has set a standard for dependency within the meaning of the wrongful death statute stating that "proof of dependency must show a need or necessity of support on the part of the person alleged to be dependent . . . coupled with the contribution to such support by the deceased." *Id.* at 88 (quoting *New York Central Railroad Co.*

---

**6.** Effective in 1998, this section was repealed and recodified as Indiana Code Section 34–23–2–1.

**7.** Also effective in 1998, this section was repealed and recodified as Indiana Code Section 34–23–1–1.

**8.** Apart from medical, hospital, funeral and burial expenses which inure exclusively to the decedent's estate.

v. *Johnson*, 234 Ind. 457, 127 N.E.2d 603, 607 (1955)); *see also Koger v. Reid*, 417 N.E.2d 1142, 1145 (Ind.Ct.App.1981). In other words, "dependency must be actual, amounting to a necessitous want on the part of the beneficiary and a recognition of that necessity on the part of the decedent, an actual dependence coupled with a reasonable expectation of support or with some reasonable claim to support from the decedent." *Kirkpatrick v. Bowyer*, 131 Ind.App. 86, 169 N.E.2d 409, 412 (1960) (quoting 25 C.J.S. Death § 33, p. 1108).

Recently, we have had various opportunities to address the issue of what constitutes a dependent next of kin. In *Necessary v. Inter–State Towing*, 697 N.E.2d 73 (Ind.Ct. App.1998), *trans. denied*, we reversed the grant of partial summary judgment where a jury could conclude that a mutual dependency existed based on a condition and not a promise, that such dependency was actual, that it was both needed and wanted by the dependents, that decedent realized the need, and that the dependents had a reasonable expectation that decedent's financial and non-financial contributions would continue. *Id.* at 78. We further explained that the decedent's contributions were neither occasional, nor irregular, but were made on a daily basis over an extended period of time. We reiterated that it is not necessary that the dependents be wholly dependent to establish a dependency claim under the statute. *Id.*

In *Luider v. Skaggs*, 693 N.E.2d 593, 596–97 (Ind.Ct.App.1998), *trans. denied*, we concluded that a jury question was presented on the issue of dependency notwithstanding the surviving next of kin's full-time, gainful employment from which he earned nearly $30,000 per year. *See also Chamberlain v. Parks*, 692 N.E.2d 1380, 1383–84 (Ind.Ct. App.1998) (concluding that parents were not dependent next of kin where decedent occasionally performed services for parents, but did not contribute in a tangible and material way so as to satisfy the contribution prong in the test for dependency; his actions amounted to no more than gifts, donations and acts of generosity expected of a son to whom free housing, most of his board, gasoline money and automobile insurance was provided),

*trans. denied; Estate of Miller*, 691 N.E.2d 1310, 1311 (concluding that parents' alleged "need" was more of an "expectation" where decedent made no financial contributions to his parents, made only occasional contributions of services to the family business, and was claimed as a dependent on parents' tax returns).

■ The aforementioned recent dependent next of kin cases arose in the summary judgment context. In contrast, Mother's case went to trial, during which Mother took great pains to demonstrate that she was a dependent next of kin of Taylor. She testified that as a divorced custodial parent of three children, she received support from Taylor. In particular, she introduced evidence that Taylor helped around the house, cleaned the house, cut grass, shoveled snow, and washed cars. Taylor, who had a paper route and was paid by others to cut their grass, made regular monetary contributions to his mother. His support helped Mother attend nursing school while she held down a full time and a part time job.

Faced with the above evidence, the jury awarded Mother $296,071.10 under the adult wrongful death statute. Recalling that partial dependency is sufficient to establish the necessitous want prong, *Necessary*, 697 N.E.2d at 76, we cannot say the jury erred as a matter of law in finding Mother to be a dependent next of kin of Taylor. However, the jury also awarded $257,120.00 under the child statute. As explained *supra*, if a parent is a dependent next of kin, then recovery is proper under the adult statute, but precluded under the child statute since a "child" must have no dependents. Therefore, the $257,120.00 award was inconsistent with the $296,071.10 award. Since Mother pursued recovery under the adult statute (using the dependent next of kin theory), we conclude that the $257,120.00 award under the child statute was improper.

Finally, we reach the last question: whether the award of damages under both state and federal law was duplicative and thus improper. The jury was instructed that if the Defendants were liable under Indiana's child wrongful death statute, then Mother was entitled to an award for the loss of

Taylor's love and companionship as well as the loss of his services and the reasonable expense of psychiatric and psychological counseling incurred by Mother due to Taylor's death. The jury responded by awarding $250,000.00 for the loss of love and companionship. The jury was also instructed that if the Defendants were liable under the Fourteenth Amendment, then Mother was entitled to compensatory damages for the value of the society and companionship of Taylor. The jury awarded a separate $250,000.00 for the loss of Taylor's society and companionship.

The Defendants assert that the two awards of $250,000.00 constitute double recovery for the same injury. Having previously determined that the jury should not have awarded damages to Mother under the child wrongful death statute because Taylor had a dependent (Mother), we conclude that this double recovery issue is moot. That is, since the award under the child statute must be vacated, it can no longer be argued that an award to Mother for the loss of Taylor's society and companionship under the Fourteenth Amendment is duplicative of the award for the loss of Taylor's love and companionship under the child statute. To reiterate, the $257,120.00 award under the child statute, which includes damages for the loss of love and companionship, is no longer valid. The balance of the jury's award remains unchanged.

Affirmed in part and reversed in part.

RUCKER, J. and RILEY, J. concur.