Trina SMITH, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 55A01–9811–CR–407.

Court of Appeals of Indiana.

Oct. 29, 1999.

Transfer Denied Dec. 27, 1999.

Steven C. Litz, Monrovia, Indiana, Attorney for Appellant.

Jeffrey A. Modisett, Attorney General of Indiana, Thomas D. Perkins, Deputy Attorney General, Indianapolis, Indiana, Attorneys for Appellee.

## OPINION

BAKER, Judge

Appellant-defendant Trina Smith appeals her conviction and sentence on two counts of Neglect of a Dependent Resulting in Serious Bodily Injury,[1] as a Class B felony, and one count of Neglect of a Dependent,[2] as a Class D felony. Smith raises multiple issues and sub-issues, which we restate as five. Smith first asserts that the trial court erred in allowing the State to amend the charges to add eight new counts of neglect after it had dismissed a single count of neglect covering Smith's child's lifetime. Second, Smith argues that the court erred in using the existence of the severed charges as an aggravating factor and in failing to merge the neglect

---

1. Ind.Code § 35–46–1–4(a).

2. I.C. § 35–46–1–4(a).

convictions, resulting in the maximum possible sentence of thirty-three years. Third, Smith contends that the trial court should have granted a resentencing hearing after allegedly admitting to bias against her. Fourth, Smith asserts multiple errors in the trial court's evidentiary rulings, which we will consider individually below. Finally, Smith argues that the evidence is insufficient to convict her of neglect of a dependent.

## FACTS [3]

The facts most favorable to the verdict reveal that B.N.S. was born to Smith on July 11, 1997. On April 29, 1998, when B.N.S. was nine months old, Morgan County Sheriff Deputy Brian Ringer was sent to Smith's apartment to investigate the death of B.N.S. When he arrived, Deputy Ringer noted that B.N.S.'s body was cool to the touch and that there was noticeable bruising on her face, head, hands, forearms, and over the rest of her body. B.N.S.'s cause of death, according to the coroner's report, was a subdural hematoma secondary to a skull fracture that occurred approximately forty-eight hours prior to her death.

Smith claimed that her three-year-old son K.C. had awakened her on April 29, 1998 because B.N.S. had been crying. Smith also told Deputy Ringer that her son had tried to pick up B.N.S. but had dropped her and B.N.S. then stopped breathing. Smith stated that she then called 911. Prior to B.N.S.'s death, Smith told a neighbor that K.C. had reported to her that her co-habiting boyfriend, Tim McSchooler, had spanked B.N.S. and thrown her against the wall.

The coroner's report revealed that, in addition to the injury which caused her death, B.N.S. had suffered fractures to both her right and left shins sometime between two weeks and two months prior to her death, a right hand fracture a week to a month prior to her death, and also a torn trachea, a lacerated glottis, and a torn spleen. In addition, she was malnourished.

On April 30, 1998, the State charged Smith with Murder [4] and one count of Neglect of a Dependent Resulting in Serious Bodily Injury, covering the entire length of B.N.S.'s life. Smith moved to dismiss the latter charge because it did not state the offense with sufficient certainty to allow her to present a defense, and the trial court granted Smith's motion. The court subsequently permitted the State to amend the information to include eight separate counts of neglect. Smith requested that all eight neglect counts be dismissed or, alternatively, that they be severed from the murder charge. The trial court permitted Smith to make additional objections to the amended information and ultimately allowed five counts to be severed because they were chronologically removed from the three remaining neglect counts.[5] Thus, Smith was tried on one count of murder and the following counts: first, that Smith had the care of B.N.S., a dependent, and knowingly deprived her of necessary support by failing to seek medical attention which resulted in serious bodily injury, namely death; second, that Smith knowingly placed B.N.S. in a situation which was dangerous to her life or health and which resulted in a skull fracture; and third that Smith had failed to provide proper nourishment for B.N.S.

---

3. Smith's statement of facts includes statements such as: "Tragically for [B.N.S.],Trina did not see McSchooler for what he truly was. Tragically for Trina, the trial court, through its incorrect rulings, blinded the jury as well." We remind defense counsel that it is inappropriate to place argument in the statement of facts. *G.H. Skala Constr. Co. v. NPW, Inc.,* 704 N.E.2d 1044, 1045–46 n. 1 (Ind.Ct.App. 1998), *trans. denied.*

4. IND.CODE § 35–42–1–1(1).

5. The five severed counts alleged that Smith had knowingly placed B.N.S., a dependent, in a situation which endangered her life or health, resulting in, respectively, a lacerated glottis, a broken second metacarpal of the right hand, a contusion of the spleen, and fractures of the left and right tibias.

In addition to the motion to sever charges, Smith filed a series of pre-trial motions concerning evidentiary matters. In response, the trial court refused to admit certain statements of Tim McSchooler, allowed Smith to redact certain portions of the statement she gave to police on the day of B.N.S.'s death, and granted a gag order directing the parties not to discuss counsel's theory that McSchooler was the murderer. An extensive hearing was held pertaining to evidence of injuries which B.N.S. suffered and which formed the basis for the severed counts, after which the court held that such evidence was admissible, not for showing Smith's propensity to commit the crime, but to demonstrate "intent, knowledge, identity and absence of mistake or accident on the part of [Smith]." Record at 276.

At Smith's jury trial, which commenced on July 17, 1998, the trial court denied Smith's renewed motion for severance of all the neglect charges and Smith's request to present some twenty-one witnesses who would testify regarding McSchooler's prior verbal and physical expressions of hostility toward B.N.S. On July 30, 1998, the jury acquitted Smith of murder and convicted her of the three neglect charges. Counsel for Smith instructed Smith's probation officer not to talk to Smith about the case, after which the trial court directed the officer to attempt to speak to Smith. Smith refused any communication. Based on the trial court's instruction to the probation officer, Smith filed a motion to recuse, which the trial court denied.

Smith's sentencing hearing was held on August 27, 1998. Smith renewed her motion for recusal, which the court denied. After hearing evidence on sentencing, the trial court addressed Smith:

> I have never ever in the eighteen years, almost nineteen years, that I have been in the criminal justice system, both as a prosecutor and as a judge, ever felt as frustrated about a case. I, like the jury, do not feel to a moral certainty that I know who inflicted these blows ... either this defendant or the co-defendant [McSchooler].... And I have never felt that before at the end of a case. And that is very frustrating. And yes, I would have liked to heard ... hear from the defendant. I think that's a very human response but the legal part of me knows exactly why you did what you did. And I have no problem with that and it has not been considered as against the defendant. That's her right and I understand that. I have struggled with the ... the human side of myself, as well as the legal side of myself in this case. It's a very, very hard case. The emotional aspects of this case are overwhelming....
>
> But lawyers are a little bit schizophrenic, Ms. Smith, in that we have human responses but we also have legal responses. And I've had to balance those, but the legal side will always win as long as I'm a judge on a case. And if it can't win then I will disqualify myself. If I feel so emotional about a case that I cannot follow the law then I would not stay on a case. So I feel very confident that I have followed the law in your case and I will follow the law in imposing your sentence. But regardless of whether you or Tim McSchooler inflicted the actual blows, you are the only person who could have prevented these injuries. You could have prevented the entire situation. You could have stopped it in the middle and you could have sought medical treatment in time to save that baby's life. And therefore, not only are you legally responsible for these charges and the sentence that I'm about to impose but you are morally responsible.

R. at 2227–28. The court went on to note as mitigating factors that Smith had no prior criminal convictions or arrests, that Smith was young, and that, because she has a dependent, incarceration would present a hardship. The court noted as aggravating factors that the victim, who was under one year old, was mentally and

physically infirm; that Smith needed correctional and rehabilitative treatment; and that she lacked remorse. Additionally, the trial court considered as an aggravating factor the other injuries to B.N.S. which formed the basis for the severed charges, "only in that those injuries were so severe that I do not ... I cannot comprehend how you, as a mother, did not understand that the child needed to see a doctor for multiple injuries ... that child had to have given you indications." R. at 2230.

The trial court sentenced Smith to a twenty-year sentence for each of the two Class B felonies, to run consecutively. The court then acknowledged the limitation imposed on the consecutive sentences by I.C. § 35–50–1–2(c), which provides in relevant part that:

> the court shall determine whether terms of imprisonment shall be served concurrently or consecutively.... However, ... the total of the consecutive terms of imprisonment ... to which the defendant is sentenced for felony convictions arising out of an episode of criminal conduct shall not exceed the presumptive sentence for a felony which is one (1) class of felony higher than the most serious of the felonies for which the person has been convicted.

The presumptive sentence for a Class A felony, one class higher than Smith's Class B felony convictions, is thirty years. I.C. § 35–50–2–4. Therefore, the trial court imposed the maximum sentence possible for the two Class B felonies of thirty years. It then ordered Smith's three-year sentence for the Class D felony to run consecutively to the other two for a total of thirty-three years. Smith now appeals.

## DISCUSSION AND DECISION

### I. Amendment of the Information

■ Smith first contends that the trial court erred in allowing the amendment of the information. Specifically, she argues that the State in effect retaliated against her for moving to dismiss the first, general charge of neglect by bringing eight separate charges.

■ We note initially that the trial court may permit an amendment to an information at any time before or during trial with respect to any defect, imperfection, or omission so long as the amendment does not prejudice the substantial rights of the defendant. IND.CODE § 35–34–1–5(c). The test of whether the State should be allowed to amend an information is whether the amendment affects the availability of a defense or the applicability of evidence that existed under the original information. *Wilkinson v. State*, 670 N.E.2d 47, 48 (Ind. Ct.App.1996), *trans. denied.*

In the instant case, Smith was originally charged with neglecting B.N.S. for the entire nine months of B.N.S.'s life. R. at 70. The State was allowed to amend the information after Smith moved to have the original charge dismissed. R. at 126–27. The trial court did not err in allowing the State to amend the original charge, which was impermissibly vague. *See* I.C. § 35–34–1–5(c). The amendment did not affect the ability of Smith to prepare a defense or the applicability of evidence that existed under the original defense. *See Wilkinson*, 670 N.E.2d at 48. The trial court thus properly allowed amendment to the original charge.

### II. Alleged Errors of Sentencing

■ Smith next asserts that the trial court erred in imposing a thirty-three year sentence. Specifically, Smith maintains that, although her convictions do not violate Double Jeopardy, the court nonetheless should have merged the charge of failure to seek medical attention for B.N.S. with the charge of placing B.N.S. in a situation which resulted in a skull fracture because the two constitute a single instance of inaction on her part. She further argues that the trial court erred in using the severed charges as an aggravating factor, and she makes arguments against each aggravating factor.

We note that the determination of a sentence rests within the discretion of the trial court. *Newman v. State*, 690 N.E.2d 735, 737 (Ind.Ct.App.1998). Trial courts enjoy a wide discretion to impose enhanced sentences, consecutive sentences, or both. *Id.* We will not alter a sentence authorized by statute unless the sentence is manifestly unreasonable in light of the offender and the offense. *Snyder v. State*, 655 N.E.2d 1238, 1241 (Ind.Ct.App.1995). Furthermore, the trial court need list only one aggravating circumstance to support an enhanced sentence. I.C. § 35–50–1–2(c).

In this case, Smith concedes that placing a child in a situation in which it is physically harmed, and then failing to seek medical attention for that child are two separate crimes with separate elements. However, Smith argues that even where acts constitute separate criminal offenses, they may be so related as to constitute a single transaction. In support, Smith cites *Nunn v. State*, 695 N.E.2d 124, 125 (Ind.Ct.App. 1998), in which we reversed a multiple count conviction for attempted murder where there was one victim at whom the defendant fired multiple gun shots.[6] We do not believe that Smith's failure to seek medical attention for hours after placing B.N.S. in a dangerous situation constitutes a "single offense" as does the firing of multiple gunshots within seconds of each other. The trial court was in its discretion to sentence Smith for separate Count B felonies rather than merging the two.

With respect to Smith's argument that the trial court did not properly consider aggravating and mitigating circumstances, we note that the trial court considered several mitigating factors in sentencing Smith, namely, her youth, her lack of criminal history and the hardship her incarceration would present to her other child. R. at 2228–29. The court also considered not one but four separate aggravating factors: the fact that B.N.S.'s young, pre-verbal age amounted to a mental and physical infirmity, Smith's need for correctional and rehabilitative services, Smith's lack of remorse, and the fact that there were other injuries to B.N.S. which were not part of the trial. R. at 2229–30. The trial court also determined that the aggravating factors far outweighed the mitigating ones. R. at 2230. Smith mounts arguments against each aggravator. We do not separately address all of her arguments here. · However, we note that the aggravating factor which states that the defendant is in need of correctional and rehabilitative treatment must be taken to mean that the defendant needs such treatment "in excess of the presumptive sentence term." *Mayberry v. State*, 670 N.E.2d 1262, 1270 (Ind.1996). Furthermore, the record must demonstrate "how such rehabilitation could be achieved through imposition of an enhanced sentence rather than the presumptive sentence." *Taylor v. State*, 695 N.E.2d 117, 122 (Ind.1998). We do not see such evidence in the record in this case. But any error is harmless because even one aggravator is sufficient to impose an enhanced sentence. *See Snyder*, 655 N.E.2d at 1241. Here, the undeniably young age of the victim would be sufficient to enhance Smith's sentence.

Finally, Smith claims that the trial court improperly considered the pending, severed charges as an aggravator. However, a criminal charge which is pending at the time of sentencing may be considered an aggravating circumstance. *Fourthman v. State*, 658 N.E.2d 88, 91 (Ind.Ct.App. 1995), *trans. denied*. The trial court did not err in its consideration of mitigating and aggravating factors.

### III. Recusal

Smith further asserts that the trial court judge should have recused herself

---

6. We note that, while Smith admits double jeopardy is not violated in her case, she cites *Nunn*, which was decided on double jeopardy grounds.

before sentencing. First, Smith points out that the judge recused herself from hearing the remaining charges against Smith. Second, Smith maintains that the judge demonstrated bias against her in ordering a probation officer to speak to Smith when counsel had instructed the officer not to, and in making the statement at sentencing which is cited in the *FACTS*.

We note initially that a judge is presumed to be unbiased and unprejudiced. *In re Adoption of Johnson*, 612 N.E.2d 569, 572 (Ind.Ct.App.1993), *trans. denied*. The record must show bias and prejudice against the defendant before judgment will be reversed on the ground that the trial judge should have been disqualified. *Beverly v. State*, 543 N.E.2d 1111, 1115 (Ind.1989).

In this case, the judge indeed recused herself from hearing the other charges against Smith. However, the judge's statement at sentencing reveals her commitment to following the law and recusing herself when she cannot: "If I feel so emotional about a case that I cannot follow the law then I will not stay on a case. So I feel very confident that I have followed the law in imposing your sentence." R. at 2228. Undisputedly, the trial judge acknowledged the inevitable human reaction to a situation where a very young child dies of preventable causes while in her mother's care. In doing so, Judge Craney simply revealed her humanity, a quality which each member of the judiciary and bar should respect. Such a revelation does not rise to the level of bias or prejudice. Judge Craney also clearly expressed her understanding that she must follow the law in sentencing. Smith has not demonstrated that, when deciding to recuse herself from hearing the remaining charges, the trial judge exhibited bias toward her. We will not predicate error upon a judge's acknowledgment of human feelings.

Furthermore, Smith offers no citation to authority to support the claim that when the trial judge ordered the probation officer to speak to Smith, the judge demonstrated bias or that any prejudice resulted. A defendant convicted of a felony may not be sentenced before a written presentence report is prepared by a probation officer and considered by the sentencing court. IND.CODE § 35–38–1–8(a). Presentencing reports include any matters which the court directs to be included, as well as the circumstances attending the commission of the offense, the convicted person's history of delinquency or criminality, social history, employment history, family situation, economic status, education, and personal habits. I.C. § 35–38–1–9(b). A presentence report will also include victim impact statements and any other material the officer deems relevant. I.C. §§ 35–38–1–8.5(d), 35–38–1–9(c). Thus, it may be in the defendant's interest to speak with the probation officer, and the judge's order that the officer attempt to speak with Smith is not a demonstration of bias. Moreover, Smith's sentence was legally permissible and proportionate to the crimes involved, and it will not be reversed where no bias or prejudice is shown. *See Beverly*, 543 N.E.2d at 1115.

### IV. Errors in Evidentiary Rulings

#### A. Autopsy Photograph

Smith asserts that the trial court erred in admitting an autopsy photograph of B.N.S. Specifically, Smith argues that the autopsy photo had more prejudicial than probative value and thus the trial court should not have admitted it.

We observe that photographs which depict a victim's injuries are generally relevant and admissible. *Harrison v. State*, 699 N.E.2d 645, 647 (Ind.1998). To exclude photographs on relevancy grounds, a defendant must show that their improper influence on the jury would outweigh their probative value to the extent that they are unduly prejudicial. *Id.* (citing Ind. Evidence Rule 403).

In this instance, the autopsy photo depicts the nature and placement of the sub-

dural hematoma that killed B.N.S. The photo assisted the doctor who testified regarding the fatal injury and its cause, blunt force trauma. Smith has not demonstrated that the photos were unduly prejudicial, and we conclude that the photo was properly admitted.

### B.  Consideration of Severed Charges

█ Smith next argues that the trial court erred in allowing the State to use evidence of all the injuries sustained by B.N.S. to "prove intent, knowledge, identity and absence of mistake," because such evidence was not necessary. R. at 276. Specifically, Smith contends that, because she did not intend to argue that B.N.S.'s death was accidental, the State was not trying to present evidence in rebuttal of such argument but rather to show her propensity to commit the charged acts.

█ We note that evidence of other crimes is not permissible to prove the character of a person in order to show action in conformity therewith. Ind. Evidence Rule 404(b). To admit evidence of other crimes or wrongs, the trial court must determine that (1) such acts are relevant to a matter at issue other than the defendant's propensity to commit the charged act; and (2) the probative value of the evidence outweighs its prejudicial effect. *McEwen v. State*, 695 N.E.2d 79, 87 (Ind.1998). Because the balancing of probative value and prejudicial effect is fact sensitive, the determination will only be reversed upon an abuse of discretion. *Cox v. State*, 696 N.E.2d 853, 862 (Ind.1998).

In this case, the State properly filed notice to use evidence of Smith's other bad acts involving B.N.S. R. at 232–44. The trial court allowed evidence of B.N.S.'s broken legs, injured spleen, broken hand, lacerated glottis, and bruises, some of which were the subject of the severed charges. In determining that this evidence was admissible, the court reasoned that the evidence of these injuries tended to show Smith's intent, motive, and state of mind regarding her neglect of B.N.S. R. at

230–31. *See* Evid. R. 404(b). The evidence of multiple injuries, the conversations Smith had about some of the visible injuries with family members and others, and Smith's articulated fear that an examining doctor might report the child's injuries to the authorities all serve to describe Smith's intent, motive, and state of mind regarding her neglect. We do not find admission of this evidence to be an abuse of discretion by the trial court, but rather find that the evidence fits the exception of Evid. R. 404(b). *See Cox*, 696 N.E.2d at 862. The trial court did not err in admitting evidence of B.N.S.'s other injuries.

### C.  Excluded Statements

█ Smith next claims that the trial court erred in excluding statements by her son K.C. and by several of McSchooler's acquaintances, all of which tended to incriminate McSchooler. We examine first an alleged statement by her three-year-old son K.C. While K.C. was watching television with his father weeks after Smith was arrested, K.C. saw a male on the program enter a room where a baby was crying. K.C. said, "Oh-oh. The baby's in trouble. He's gonna hit her because she's crying." R. at 1756. Smith claims that this is an excited utterance and thus admissible hearsay. She further claims that the statement is "compelling evidence" that Smith "had no idea" of McSchooler's having harmed B.N.S. R. at 30.

We need not decide whether this alleged statement by K.C. constitutes an excited utterance because we conclude the statement adds nothing to the evidence. There was evidence that McSchooler had injured B.N.S. R. at 1646, 1979. But K.C.'s statement does not specifically offer such evidence. Moreover, we are at a loss to understand how this alleged statement in any way proves that Smith had no knowledge of McSchooler's behavior toward B.N.S. The trial court did not err in excluding K.C.'s alleged statement.

Smith also asserts that the trial court erred in refusing to allow into evidence statements by McSchooler's acquaintances regarding McSchooler's expressions of dislike for Smith and her children and his wish to kill the children because they kept him awake. Smith maintains that such statements could have been admitted as statements against interest. Ind. Evidence Rule 804(b)(3).

We observe first that statements against interest are admissible if, at the time they were made, they tended to subject the declarant to criminal liability such that a reasonable person in the declarant's position would not have made them if he did not believe in their truth. Evid. R. 804(b)(3). Our supreme court has found that the hearsay exception for declarations against interest was not applicable when the speaker may not have realized that his statements constituted admission that he had perpetrated a crime. In *Jervis v. State*, 679 N.E.2d 875, 878 (Ind.1997), the court found that a statement that the declarant had gone out "partying" with an unnamed woman and then "dumped her off" behind a cinema, where a woman's body was found, did not subject the declarant to criminal liability and was not admissible under the exception for statements against interest. Furthermore, we note that errors in the exclusion of evidence are reversible only where the error harmed the party asserting error. *Harrison v. State*, 575 N.E.2d 642, 648 (Ind.Ct.App. 1991).

Here, all of the excluded statements merely tended to prove that McSchooler had a motive to harm B.N.S. because her crying kept him awake. R. at 1669–89. None of the statements can be interpreted as subjecting McSchooler to criminal liability and thus none of the statements fit the hearsay exception of statement against interest. *Jervis*, 679 N.E.2d at 878.

Furthermore, the statements are cumulative of other testimony which also tended to exculpate Smith and incriminate McSchooler with regard to the murder charge. For example, there was testimony that McSchooler had kicked B.N.S.'s car seat while she was in it. R. at 1973–75. Finally, Smith was acquitted of the murder charge, and thus she cannot claim prejudice resulted from the excluded evidence. We conclude that the trial court did not err in excluding the statement of K.C. and the testimony of McSchooler's acquaintances.

### D. Admission of Smith's Statement to Police

Smith further alleges that the trial court erred in admitting her statement to the police because she did not voluntarily relinquish her right to remain silent. Rather, she contends that police statements to her that she was "not in trouble now," R. at 1140, were the basis for her decision to talk to them without a lawyer present.

The decision whether to admit a defendant's custodial statement is within the discretion of the trial court. *Ellis v. State*, 707 N.E.2d 797, 801 (Ind.1999). In making a determination as to the voluntariness of a statement, the trial court must consider the totality of the circumstances. *Id.* The court also attempts to insure that a confession was not obtained through inducement, violence, threats or other improper influences so as to overcome the free will of the accused. *Id.* Furthermore, when confronted with an ambiguous request for counsel, police are not required to ask clarifying questions. *Taylor v. State*, 689 N.E.2d 699, 703 (Ind. 1997).

In this case, prior to giving her statement, Smith was informed of her *Miranda* rights and signed a waiver of those rights. R. at 2692. She was free to leave during the interrogation. R. at 2694. Moreover, Smith did not unequivocally request counsel. Rather she asked, "[D]o I need a lawyer for something?" and further stated, "Well, I don't really understand what you guys are doing ... why do I need one?"

R. at 1138. Confronted with such equivocal statements, the police were not required to stop questioning Smith. *See Taylor*, 689 N.E.2d at 703 ("I guess I really want a lawyer, but, I mean, I've never done this before so I don't know" was equivocal statement by defendant and did not require police to cease questioning or ask clarifying questions). We conclude that the trial court did not err in admitting Smith's statement to police.

### E. Admission of McSchooler's Statements

Smith next asserts that certain statements by McSchooler, made when he was brought into the room where Smith was giving her statement to police, should not have been admitted into evidence. Specifically, she argues that the statements were hearsay and that they were erroneously admitted into evidence when she lacked the opportunity to cross-examine McSchooler.[7]

■■■ Hearsay is an out-of-court statement offered for the truth of the matter asserted. Ind. Evidence Rule 801(c). In general, hearsay is not admissible into evidence. Evid. R. 802. If a statement is offered for a purpose other than to prove the fact asserted therein, a non-hearsay purpose, then it is admissible if it is relevant and if the danger of unfair prejudice does not substantially outweigh its probative value. *City of Indianapolis v. Taylor*, 707 N.E.2d 1047, 1056 (Ind.Ct.App.1999). Even when hearsay evidence is erroneously admitted, that fact does not require reversal if the error did not prejudice the defendant's substantial rights. *Leslie v. State*, 670 N.E.2d 898, 901 (Ind.Ct.App. 1996). To determine whether an evidentiary ruling affected a defendant's substantial rights, we assess the probable impact upon the jury. *Robinson v. State*, 693 N.E.2d 548, 553 (Ind.1998).

In this instance, the statements to which Smith objects include McSchooler's asking: "And isn't it the truth Trina, when I would come home in the mornings from work, that is when you would show me bruises and ask me about them? I mean like ... how did she get that scratch on her eye and all of that kind of stuff?" R. at 1464. "But let me ask you this. Did I ever like shake her head and she cry then like I hurt her?" R. at 1475. "Did your Dad tell you not to take [B.N.S.] to the Doctor?" R. at 1415.

■■■ We find that, among the many statements to which Smith objects, some were not hearsay, offered to prove the truth of a matter upon which Smith could not cross-examine McSchooler. Rather, the statements were part of a tape in which Smith's own answers were the focus. For example, "Did your Dad tell you not to take [B.N.S.] to the Doctor?" R. at 1415, does not constitute hearsay and was offered for the non-hearsay purpose of eliciting Smith's reply. We must next inquire whether the evidence is relevant and if the danger of unfair prejudice does not substantially outweigh its probative value. *Taylor*, 707 N.E.2d at 1056. In this case, the statements introduced for a non-hearsay purpose do not raise the danger of unfair prejudice. Instead, they merely provide the background against which Smith's answer is offered. The trial court did not err in admitting them.

■■■ On the other hand, certain statements, such as "I mean, you were with [B.N.S.]," R. at 1459, were conceivably hearsay. For these latter statements, we must make further inquiry into whether any prejudice resulted. We note first that Smith was found not guilty of murdering B.N.S. Thus, no prejudice resulted regarding the murder charge. As to the charges of neglect of which Smith was convicted, the evidence in this case as a whole demonstrated that Smith neglected B.N.S.[8]

---

7. McSchooler asserted his Fifth Amendment rights and did not testify at Smith's trial.

8. We discuss the nature of the evidence supporting the neglect counts in section V., *infra*.

The probable impact on the jury of erroneously admitted hearsay statements of McSchooler could not have been significant in comparison with the rest of the remaining evidence supporting the conviction. We find the trial court did not err in admitting McSchooler's statements.

### F. Bringing McSchooler Before the Jury

Smith further contends that the trial court deprived her of her right to present evidence when it refused to allow her to bring McSchooler physically before the jury so that the jury could observe McSchooler personally. A trial court has control over the presentation of evidence to avoid needless consumption of time. Ind. Evidence Rule 611(A)(2). Here, a picture of McSchooler and his height and weight were already in evidence. R. at 683, 1825. A three-dimensional view of McSchooler would have been cumulative. The trial court did not err in refusing Smith's request.

### V. Sufficiency of the Evidence

Lastly, Smith argues that there was insufficient evidence to convict her of neglect of B.N.S. Specifically, she maintains that, even accepting the State's entire case as undisputed, the evidence was insufficient to prove that she knowingly deprived B.N.S. of medical attention or that she placed B.N.S. in a situation which resulted in a fractured skull.

We note that, in reviewing a claim for insufficiency of the evidence, we view the evidence most favorable to the State and consider all reasonable inferences to be drawn therefrom. *Fields v. State*, 679 N.E.2d 898, 900 (Ind.1997). The Court neither reweighs the evidence nor judges the credibility of witnesses. *Id.* If there is substantial evidence upon each element to support the verdict, the conviction should be affirmed. *Id.*

I.C. § 35-46-1-4 provides in relevant part:

(a) A person having the care of a dependent ... who knowingly or intentionally:

(1) places the dependent in a situation that may endanger his life or health; ... [or]

(3) deprives the dependent of necessary support; ...

commits neglect of a dependent, a Class D felony. However, ... the offense is a Class B felony if it results in serious bodily injury.

In order to prove that the defendant acted knowingly, the State had to show that she was "subjectively aware of a high probability that [s]he placed the child in a dangerous situation." *Thames v. State*, 653 N.E.2d 517, 517 (Ind.Ct.App.1995).

In the instant case, the evidence demonstrated that when B.N.S. was found dead in Smith's apartment, she was covered with bruises on her face, head, hands, forearms, and over the rest of her body. R. at 577–78, 603, 612, 629–32, 659–72. Smith was also aware of a spot that had been soft, then became hard, on B.N.S.'s head. R. at 1051, 1252. Less than two days before B.N.S.'s death, McSchooler's sister saw B.N.S. and noted bruises on the "entire left side of the head." R. at 1016. When she remarked upon the bruises, Smith told her that B.N.S. "had a habit of hitting her head on the inside of the crib." R. at 1019. Smith stated to police that she did not take B.N.S. to the doctor despite her concern about the apparent injuries for fear the doctor would take B.N.S. away from her. R. at 1352, 1359, 1360. Smith also told a neighbor that her son K.C. had reported to her that McSchooler had spanked B.N.S. and thrown her against the wall. R. at 746.

Despite B.N.S.'s multiple, visible injuries and signs of distress, and the statement by her son that McSchooler had hurt B.N.S., Smith continued to live with McSchooler and to occasionally leave B.N.S. alone with him, resulting finally in the injury which killed B.N.S. We conclude that a jury could reasonably have drawn inferences from the

evidence that Smith knowingly placed B.N.S. in a highly dangerous situation and that she deliberately avoided medical assistance because of concerns that her child would be taken away. We find the evidence amply sufficient to convict Smith of neglect of a dependent resulting in serious injury and death.

## CONCLUSION

In summary, we find that the trial court did not err in allowing the State to amend the charges against Smith, in considering aggravating factors, in imposing consecutive sentences, in refusing to allow a resentencing hearing, or in making its evidentiary rulings. Furthermore, the evidence was amply sufficient to convict Smith as charged.

Judgment affirmed.

SHARPNACK, C.J., and MATTINGLY, J., concur.