Kristie L. TRAMMELL, Appellant–Defendant,

v.

STATE of Indiana, Appellee–Plaintiff.

No. 82A01–0012–CR–418.

Court of Appeals of Indiana.

June 18, 2001.

Timothy R. Dodd, Evansville, IN, Attorney for Appellant.

Steve Carter, Attorney General of Indiana, Robin Hodapp–Gillman, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BROOK, Judge.

### Case Summary

Appellant-defendant Kristie L. Trammell ("Trammell") appeals her conviction for neglect of a dependent [1] as a Class B felony. We affirm and remand.

### Issues

Trammell raises three issues for review, which we restate as follows:

I.    whether her conviction is supported by sufficient evidence;

II.   whether the trial court erred in admitting evidence of a prior bad act; and

III.  whether the trial court abused its discretion in ordering her not to become pregnant as a condition of probation.

### Facts and Procedural History

The facts most favorable to the conviction indicate that Trammell gave birth to her son, J.T., on April 25, 1999. Trammell failed to take J.T. to his two-week checkup appointment with Dr. Paul Goodlet ("Goodlet") on May 7, 1999. During an appointment on May 28, 1999, Trammell told Goodlet that she was feeding J.T. six ounces of Similac formula with iron every four hours. On July 8, 1999, Trammell failed to take J.T. to Goodlet's office for his initial round of immunizations.

Approximately six weeks before J.T.'s death, Trammell left him for a weekend in the care of her mother, Carol Hatcher ("Hatcher"). At that time, J.T. was still consuming formula but was vomiting and suffering from severe diarrhea. When J.T.'s older sister, S.P., experienced digestive problems, weight loss, and dehydration as a newborn, Trammell "had to fight the doctors at the hospital to take her"; S.P. subsequently underwent corrective esophageal surgery. Hatcher observed J.T.'s vomiting and diarrhea over the weekend and told Trammell to take him to the doctor "because he acts like he's got the same thing that [S.P.] ... had." Trammell told Hatcher that she would "call and make an appointment for him" but failed to do so. When Trammell left J.T. in Hatcher's care on the weekend before his death, she informed her mother that she had begun feeding him water and 2% milk due to his diarrhea. According to

1.  *See* Ind.Code § 35–46–1–4.

Hatcher, J.T.'s eyes "looked funny" and "deep set into his head." Hatcher fed J.T. whole milk and rice cereal, and J.T. experienced neither vomiting nor diarrhea.

Shortly after midnight on September 20, 1999, Trammell returned home from shopping and fed J.T., who vomited up much of his milk. Trammell then put J.T. to sleep in a bedroom. When Trammell awoke that morning, she "peeked" into J.T.'s room and saw him lying in his bassinet. Trammell then left the house to run errands without feeding J.T. Trammell returned home around 3:30 p.m., then left to buy food for her boyfriend and milk for S.P. Trammell came home, changed S.P.'s diaper, ate some food, and moved some outdoor plants into her house before checking on her son; J.T. had died at approximately 5:00 that morning from "emaciation, dehydration and salt or electrolyte imbalance ... due to a chronic malnutrition," according to forensic pathologist Dr. John Heidingsfelder ("Heidingsfelder"), who performed the autopsy.

The State charged Trammell with neglect of a dependent as a Class B felony. Prior to trial, Trammell filed a notice of insanity defense. The trial court found Trammell guilty but mentally ill due to her mental retardation [2] and sentenced her to eighteen years, with eight years thereof to be served on probation. As a condition of probation, the trial court ordered Trammell not to become pregnant.

## Discussion and Decision

### I. Sufficiency of the Evidence

■ The State charged that Trammell "did knowingly place a dependent child, to-wit: [J.T.], ... in a situation that endangered the health of said dependent child by not properly feeding and seeking proper medical attention to [J.T.] which resulted in serious bodily injury to [J.T.], to wit: death, the said Kristie Trammell having the care of said dependent child[.]" *See* IND.CODE § 35–46–1–4(a)(1); *cf. id.* § 35–46–1–4(a)(3) (neglect where person *"deprives* the dependent of necessary support") (emphasis added). Trammell contends that the evidence was insufficient to establish that she *placed* J.T. in a situation that endangered his health.

■ "[I]n reviewing a claim for insufficiency of the evidence, we view the evidence most favorable to the State and consider all reasonable inferences to be drawn therefrom." *Smith v. State*, 718 N.E.2d 794, 806 (Ind.Ct.App.1999), *trans. denied.* We neither reweigh evidence nor judge witness credibility. *See id.* If there is substantial evidence upon each element to support the verdict, we will affirm the conviction. *See id.*

In *Ricketts v. State*, 598 N.E.2d 597, 600–01 (Ind.Ct.App.1992), *trans. denied,*

---

**2.** *See id.* § 35–36–1–1 (" 'mentally ill' also includes having any mental retardation"). The trial court requested Dr. David Cerling ("Cerling") to evaluate Trammell's sanity and competency to stand trial. Cerling measured Trammell's I.Q. at 63, indicating mild mental retardation. The trial court also requested psychiatrist Dr. Gregory Unfried ("Unfried") to evaluate Trammell's sanity. Unfried told the court that he thought Trammell's I.Q. "would probably be higher" than Cerling's evaluation of 63:

I would see her as more in the borderline or low intellectual functioning range and I base that on her vocabulary such as at one point I was discussing dehydration with her and to be honest with you I was rather impressed with her comprehension of dehydration and what kind of impact that has on a child. She said the reason why was because she had another child that at one point had gotten dehydrated but, you know, based on her vocabulary and her understanding of things I think that her I.Q. is actually higher or her intelligence is actually higher than what a documented I.Q. might show perhaps due to some type of learning disability.

we noted the following distinction between subsections (a)(1) and (a)(3) of Indiana Code Section 35–46–1–4: "The verb 'place' commonly is used to describe the conduct of putting something in a particular position while the verb 'deprive' is used to describe the conduct of taking away, removing, or divesting." Thus, "the offense, defined as knowingly or intentionally placing a dependent in a situation that endangers the dependent's life or health, is the actor's knowing or intentional conduct of putting a dependent in a situation where the dependent's life or health is at risk or endangered." *Id.* at 601. Trammell argues that while her conduct of giving J.T. food "that did not have sufficient nutritional content" may constitute deprivation of J.T.'s necessary support under subsection (a)(3) of the statute, it does not constitute the conduct with which she was charged under subsection (a)(1): placing J.T. in a situation that endangered his health by not properly feeding him and seeking medical attention. She insists that "there is a failure of proof" as to whether she placed J.T. in a dangerous situation by not properly feeding him.

■ Trammell's attempt to redefine the conduct for which she was charged constitutes at most a semantic distinction without a substantive difference. "Where there are symptoms from which the average layperson would have detected a serious problem necessitating medical attention, it is reasonable for the [factfinder] to infer that the defendant knowingly neglected the dependent."[3] *Mitchell v. State*, 726 N.E.2d 1228, 1240 (Ind.2000). J.T. suffered from chronic vomiting and diarrhea after eating while in Trammell's care and was markedly underweight and undersized for his age. Heidingsfelder testified that J.T. was "at least moderately emaciated,"[4] measured twenty-three and a half inches long and just under ten pounds at almost five months old, and "fell below the lower five percentile on the growth charts in both the height and the weight."[5] Trammell knew that J.T. had trouble keeping down his food; that S.P. had exhibited similar symptoms requiring corrective surgery; and that Hatcher had told her to seek medical attention for J.T. We conclude that there is sufficient evidence to establish that Trammell was subjectively aware of a high probability that she placed J.T. in a situation that endangered his health by not feeding him properly and by not seeking medical attention for his malnutrition and dehydration as manifested by his chronic vomiting and diarrhea and emaciation. *See id.* at 1240.

## II.  Evidence of Prior Bad Act

■ Next, Trammell contends that the trial court erred in admitting over objection the testimony of a police officer regarding an October 1998 incident wherein she left two of her children unattended in an automobile in a shopping center parking lot. Trammell asserts that evidence of this prior bad act is inadmissible under Indiana Evidence Rule 404(b).[6]

---

**3.**  Trammell does not challenge the sufficiency of the evidence supporting the element of intent.

**4.**  Heidingsfelder testified that J.T.'s ribs "were prominent on the side of the chest" and "were visible without having to touch them." He further testified that J.T.'s subcutaneous fat "was about two millimeters thick over both the chest and the abdomen" and that with a "child of that age you would expect the fat to be at least five to six millimeters thick[.]"

**5.**  Heidingsfelder noted that J.T. was "somewhat premature at the time of birth" and that his birth weight of five pounds ten ounces was "a little on the light side but not terribly so."

**6.**  *See* Ind. Evidence Rule 404(b) ("Evidence of other crimes, wrongs, or acts is not admissi-

Even assuming, *arguendo*, that the trial court erred in admitting this testimony, we note that "[t]he erroneous admission of evidence does not require reversal when evidence of the same probative value is admitted without objection." *Sisk v. State*, 736 N.E.2d 250, 251 (Ind.2000). Child Protective Services supervisor Shirley Starks testified without objection that her office substantiated a police report that "some children of [Trammell's] were left in a car at the mall." There is no reversible error.

### III. No Pregnancy as Condition of Probation

■ Finally, Trammell challenges the trial court's order that she not become pregnant as a condition of probation.[7] Trammell acknowledges that Indiana Code Section 35–38–2–2.3(14) authorizes a trial court to require a person as a condition of probation to "[s]atisfy other conditions reasonably related to the person's rehabilitation" but claims that the no-pregnancy condition in this case "is an illegal and unconstitutional deprivation of her right to privacy."

■ Trammell's claim raises an issue of first impression in Indiana. We recognize that "[a] trial court has broad discretion to impose conditions of probation which will produce a law abiding citizen and protect the public. Within certain parameters, the condition may impinge upon the probationer's exercise of an otherwise constitutionally protected right." *Smith v. State*, 727 N.E.2d 763, 766 (Ind.Ct.App.

2000) (citation omitted). However, "those impingements must be designed to accomplish the explicit goals of protecting the community and promoting the probationer's rehabilitation process." *Purdy v. State*, 708 N.E.2d 20, 23 (Ind.Ct.App.1999). In other words, the condition must "have a reasonable relationship to the treatment of the accused and the protection of the public." *Carswell v. State*, 721 N.E.2d 1255, 1258 (Ind.Ct.App.1999).

> [W]here a defendant contends that a probation condition is unduly intrusive on a constitutional right, the following three factors must be balanced: (1) the purpose sought to be served by probation; (2) the extent to which constitutional rights enjoyed by law abiding citizens should be afforded to probationers; and (3) the legitimate needs of law enforcement.

*Id.* Although Trammell neither cites a specific state or federal constitutional provision safeguarding her right to privacy nor advocates a particular balancing of the three factors outlined above, the uniqueness of the condition at issue compels us to address the merits of her claim.

The trial court's order that Trammell not become pregnant while on probation was apparently intended to "protect the public by preventing injury to an unborn child," but it serves no rehabilitative purpose whatsoever. *People v. Pointer*, 151 Cal.App.3d 1128, 199 Cal.Rptr. 357, 365 (1984) (defendant, who adhered to and imposed on her children a strict macrobiotic diet, was convicted of child endangerment

---

ble to prove the character of a person in order to show action in conformity therewith.").

7. In sentencing Trammell, the trial court stated,

> The Court feels that it is important that you not bear any other children. You have established now twice you have been convicted of abusing your own children. One of

those instances of abuse has lead [*sic*] to a child's death. You struggle with an awful lot of difficulties by your own admission in dealing with the children. And so it will be the order of the Court as a part of your probation that you are not to become pregnant.

and ordered not to conceive during five-year probationary period). Indeed, it does nothing to improve her parenting skills or educate her regarding perinatal care or child nutrition and development should she choose to become pregnant after her probationary period expires or even happen to become pregnant while on probation.[8] We find the *Pointer* court's comments on this issue to be instructive:

> We believe this salutary purpose [of preventing injury to an unborn child] can adequately be served by alternative restrictions less subversive of appellant's fundamental right to procreate. Such less onerous conditions might include, for example, the requirement that appellant periodically submit to pregnancy testing; and that upon becoming pregnant she be required to follow an intensive prenatal and neonatal treatment program monitored by both the probation officer and by a supervising physician. If appellant bears a child during the period of probation it can be removed from her custody and placed in foster care, as was done with appellant's existing children, if the court then considers such action necessary to protect the infant.

*Id.*[9] These significantly less intrusive means of protecting an unborn child offer

---

**8.** In *Pointer*, the trial court stated that it "would not order appellant to have an abortion if she became pregnant" but would send her to prison because he "'expected her to live up to every single, solitary term and condition of probation'":

> This stern admonition doubtless made it apparent to appellant that in the event she became pregnant during the period of probation the surreptitious procuring of an abortion might be the only practical way to avoid going to prison. A condition of probation that might place a defendant in this position, and, if so, be coercive of abortion, is in our view improper.

199 Cal.Rptr. at 366. The *Pointer* court also raised the following relevant consideration:

> It deserves to be noted that the [no-pregnancy] condition imposed did not include a prohibition on sexual intercourse. As the trial judge stated at the sentencing hearing: "I would never require somebody to have no sexual activity; I don't think that's even suggested." The conceded fact that even the best birth control measures sometimes fail raises the possibility that appellant could conceive despite reasonable precautions to comply with the condition imposed. This might also occur if, as defense counsel pointed out at the time of sentencing, appellant reasonably relied on a sex partner's false representation that he had undergone a vasectomy.

*Id.* at n. 12.

**9.** *See also, e.g., Thomas v. State,* 519 So.2d 1113 (Fla.Dist.Ct.App.1988) (defendant was convicted of grand theft and battery and ordered not to become pregnant during probation unless she was married; court struck condition as "(1) bearing no relationship to the offense for which Thomas was convicted; (2) relating to conduct which is not in itself criminal; and (3) requiring or forbidding conduct which is not reasonably related to future criminality"); *Howland v. State,* 420 So.2d 918 (Fla.Dist.Ct.App.1982) (defendant was convicted of negligent child abuse and ordered not to father any other children during five-year probation; court concluded that this condition "does not reasonably relate to the crime of child abuse and relates to noncriminal conduct"; although this condition "could reasonably relate to future criminality—i.e., child abuse—it could do so only if appellant had custody of the child or was permitted to have contact with the child," both of which were foreclosed by "the other valid conditions of probation"); *State v. Norman,* 484 So.2d 952 (La.Ct.App.1986) (defendant was convicted of forgery and ordered not to give birth to any children out of wedlock during two-year probationary period; court vacated condition since it "(1) bears, at best, only a tangential relationship to the underlying crime, (2) relates to conduct not itself criminal, and (3) requires marriage, forbids extramarital sex, or mandates contraception, none of which are reasonably related to curtailing defendant's criminality"); *cf. State v. Kline,* 155 Or.App. 96, 963 P.2d 697 (1998) (defendant was convicted of criminal mistreatment of son, violated probation, and was ordered to "complete drug counseling and anger management

a decisively more reasonable balance of the rehabilitative, constitutional, and law enforcement factors outlined above.

With respect to the intrusiveness of the no-pregnancy condition on Trammell's privacy rights, we refer to *Carey v. Population Servs., Int'l,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977), where the United States Supreme Court considered individual privacy rights in the context of restrictions on the distribution, sale, and advertising of contraceptives:

> Although "(t)he Constitution does not explicitly mention any right of privacy," the Court has recognized that one aspect of the "liberty" protected by the Due Process Clause of the Fourteenth Amendment is "a right of personal privacy, or a guarantee of certain areas or zones of privacy." This right of personal privacy includes "the interest in independence in making certain kinds of important decisions." While the outer limits of this aspect of privacy have not been marked by the Court, it is clear that among the decisions that an individual may make without unjustified government interference are personal decisions "relating to marriage, procreation, contraception, family relationships, and child rearing and education."
>
> The decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices. That decision holds a particularly important place in the history of the right to privacy, a right first explicitly recognized in an opinion holding unconstitutional a statute prohibiting the use of contraceptives and most prominently vindicated in recent years in the contexts of contraception and abortion. This is understandable, for in a field that by definition concerns the most intimate of human activities and relationships, decisions whether to accomplish or to prevent conception are among the most private and sensitive. "If the right of privacy means anything, it is the right of the individual, married or single, to be free of unwarranted governmental intrusion into matters so fundamentally affecting a person as the decision whether to bear or beget a child."

*Id.* at 684–85, 97 S.Ct. 2010 (citations omitted). *See also State v. Mosburg,* 13 Kan. App.2d 257, 768 P.2d 313 (1989) (defendant pleaded no contest to endangering a child and was ordered not to become pregnant during two-year parole; court cited *Carey, inter alia,* and struck down condition as "unduly intru[sive]" of defendant's right to privacy: "There would be significant enforcement problems should Mosburg become pregnant, forcing her to choose among concealing the pregnancy (thus denying her child adequate medical care), abortion, or incarceration. The State should not have the power to penalize Mosburg if she uses contraceptives which for some reason fail to prevent pregnancy.").

We find the *Mosburg* court's reasoning to be persuasive here. We do not fault the trial court for attempting to prevent a similar tragedy from occurring in the future, especially in light of Trammell's criminal history, demonstrably poor parenting skills, and apparently unsuccessful involvement with social service agencies. Nevertheless, we conclude that ordering Trammell not to become pregnant while on

---

treatment before fathering any children"; condition upheld because trial court "did not impose a total ban on defendant's reproductive rights, and it explicitly retained the authority to modify or eliminate the condition if

and when defendant has completed treatment. The condition provides potential victims with protection from future injury and interferes with defendant's fundamental rights to a permissible degree.").

probation excessively impinges upon her privacy right of procreation and serves no discernible rehabilitative purpose.

In summary, then, we affirm Trammell's conviction but remand with instructions to vacate the no-pregnancy condition and, at the trial court's discretion, to modify the conditions such that they protect the community, reasonably relate to Trammell's rehabilitation, and do not excessively impinge upon her privacy rights.

Affirmed and remanded.

ROBB, J., and VAIDIK, J., concur.