IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs November 28, 2001

## STATE OF TENNESSEE v. KEENA D. MATHES

**Direct Appeal from the Criminal Court for Washington County**
**No. 25717      Robert E. Cupp, Judge**

**No. E2001-00753-CCA-R3-CD**
**January 29, 2002**

The defendant was convicted by a jury of reckless aggravated assault, a Class D felony, for cutting the victim's face with a razor blade. The trial court granted her judicial diversion, sentencing her as a Range I, standard offender to two years incarceration, but suspending the sentence and placing her on three years of probation under the supervision of the Department of Correction, including among the conditions that she pay restitution for the victim's medical bills and lost wages. Following extensive testimony as to the defendant's limited financial resources, the trial court ordered as a condition of probation that she legitimate her nine-month-old daughter to ensure that she could meet her financial obligations, including payment of restitution to the victim. In a timely appeal to this court, the defendant raises the sole issue of whether the trial court erred by requiring her to legitimate the younger of her two illegitimate children and seek child support payments for that child. We conclude that the legitimation requirement is a valid condition of probation. However, since a judgment of conviction, although not to be entered following judicial diversion, was entered in this matter, we remand for withdrawal of the judgment, the trial court to then clarify whether the defendant is to be sentenced with the sentence suspended or to be granted judicial diversion.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part, Reversed in Part, and Remanded**

ALAN E. GLENN, J., delivered the opinion of the court, in which JOSEPH M. TIPTON and JOHN EVERETT WILLIAMS, JJ., joined.

Steve McEwen, Mountain City, Tennessee (on appeal); David F. Bautista, District Public Defender; and Deborah Black Huskins, Assistant District Public Defender, Johnson City, Tennessee (at trial), for the appellant, Keena D. Mathes.

Paul G. Summers, Attorney General and Reporter; Christine M. Lapps, Assistant Attorney General; Joe C. Crumley, Jr., District Attorney General; and Steven R. Finney, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

On January 5, 2000, the defendant, Keena D. Mathes, was indicted by a Washington County Grand Jury for aggravated assault for cutting the victim's face with a razor blade. According to the presentence report, the assault occurred on September 5, 1999, during a fight between the defendant and the victim outside a nightclub, the victim receiving several major lacerations to her forehead. On May 17, 2000, a Washington County Criminal Court jury convicted the defendant of the lesser offense of reckless aggravated assault, a Class D felony. The jury recommended a $4000 fine, but the trial court reduced the fine to $500. The defendant was also ordered to pay $1187.40 in restitution for the victim's medical bills and wages lost as the result of the attack.[1]

A probation hearing was held on March 8, 2001.[2] At the beginning of the hearing, the trial court noted from the presentence report that the defendant was a high school graduate, had no prior adult criminal record, did not use illegal drugs or abuse alcohol, and reported no physical or mental problems. The court also observed that she had never been married and that she had two children with different fathers, neither of whom paid any court-ordered child support. The court further noted that, at the time of the presentence report, the defendant was receiving food stamps, living in government housing, and had lost her part-time job. At the hearing, the defendant informed the court that she was currently employed at Lakebridge Health Care Center and no longer receiving food stamps, but was still living in government housing.

The trial court had apparently already indicated to the parties in a previous hearing that it was inclined to find the defendant a suitable candidate for judicial diversion and proposed requiring her to legitimate her children as a condition of probation.[3] Therefore, after making note of the pertinent information contained in the presentence report, the court announced that it was finding the defendant suitable for judicial diversion, pursuant to Tennessee Code Annotated Section 40-35-313. The court then sentenced her as a Range I, standard offender to two years incarceration, but suspended the sentence, and ordered that she be placed on three years probation under the supervision of the Department of Correction. The remainder of the hearing was devoted to the amount of restitution and fine that the defendant would be required to pay, and the proposed requirement that she legitimate her children as a condition of her probation.

The defendant testified that she had an eight-year-old son and a nine-month-old daughter, fathered by different men. She said that her son's father was incarcerated in a federal prison in Pennsylvania with no income, and that he had no contact with her son. Her daughter's father, she said, had been with her since her son was two years old and had acted as a father to both of her

---

[1]Neither the defendant nor the State acknowledge in their briefs that the trial court ordered the defendant to pay restitution.

[2]The trial court indicated that the hearing in this case had been delayed in order to allow time for the victim's medical bills to be received.

[3]At the conclusion of the hearing, the trial court expressed surprise upon finding some notes regarding the amount of restitution and fine, and the length of the defendant's probation, that it had apparently made on August 4. Defense counsel then reminded the court that she had objected that day to the requirement that the children be legitimated, and that the court had therefore decided not to then make a final determination.

children. Although he no longer lived with them, his name was on her daughter's birth certificate,[4] and he helped her pay her bills. She said that she would tell him when a bill was due, and that he would give her one-half of the money to pay it. However, she did not say how long this arrangement had been in effect, whether it applied to all, or only certain, bills, or the total amount of his voluntary monthly contributions. When questioned by the trial court as to why her daughter's father was not present at the probation hearing, the defendant explained that he had been in Spain for the past three weeks visiting a friend who played basketball, and that he was not due to return home until sometime the next week.

The defendant testified that she worked from 12:30 to 8:30 p.m., and that her daughter's father babysat his daughter each day until 2:00 p.m., when he took her to the babysitter. She said that he was employed but did not say where he was employed, or what hours he worked.

The defendant testified that she had been working for the past seven months as a dietary aide at the health care center, earning $6.25 per hour. Explaining that she was sometimes able to work over eighty hours in a two-week pay period, the defendant said that her take-home pay ranged from $435, the smallest amount she had ever brought home, to as much as $525. However, she did not produce any pay stubs to verify this information. She testified that her expenses were as follows: $289 per month for rent; $50-60 per month for utilities; $50 per week for food; $50 per week for babysitting; $40 per month for transportation to and from work; and $40-$50 per month for cable television. She explained that she used to subscribe to "Cinemax and all that," but that presently all she had was "basic cable." She had no telephone. She said that her children were currently covered by TennCare, but would be eligible for medical insurance coverage from her work after she completed one year of employment.

The State and defense counsel agreed that the total amount of restitution owed to the victim was $1187.40, based upon the victim's lost wages and medical expenses resulting from the attack. The defendant testified that she had no problem with paying restitution to the victim. When asked by her counsel if she wished to say anything to the court about having to legitimate her children as a condition of probation, the defendant answered, "No, but I'm taking care of my kids. I'm not asking anybody else to take care of them." The trial court questioned how the defendant was able, on her income, to meet additional expenses that she had not mentioned in her list of monthly bills, such as clothing for the children, school supplies, and school lunches. The defendant responded that she was able to buy school supplies and some clothing, and said that her mother and aunt bought her son's clothes and that he received free lunches at school.

At the conclusion of the hearing, the trial court set the defendant's fine at $500 and restitution at $1187.40. The court waived all probation fees, and ordered that the defendant pay her fine, restitution, and court costs at the rate of $75 per month, beginning April 1. Finding that the

---

[4] Since the record does not show that the putative father consented in writing to his name being on the birth certificate, a rebuttable presumption of parentage does not result from the fact that it is. Tenn. Code Ann. § 36-2-304(a)(3)(B).

additional $75 monthly expense, given her income and stated expenses,[5] would compromise the defendant's ability to meet basic needs, the court ordered that she take the steps necessary to legitimate her daughter, in order to meet her financial responsibilities by ensuring regular child support from her daughter's father. The court held in abeyance the issue of whether the defendant would be required to legitimate her son since his father was incarcerated at the time of the hearing.

Following the hearing, a form probation order was entered, listing the conditions with which the defendant was to abide. The order bears the following handwritten additional conditions: "2 yr. sentence. [P]robation fees waived[.] [R]estitution $1187.40[,] fine 500.00 and costs to be paid in full[.] DNA sample[.] Child support for youngest child - is under appeal."

## ANALYSIS

### A. Standard of Review

We first must consider the standard of review to be applied. The trial court is granted broad discretion to impose conditions of probation suitable to each individual defendant. See Tenn. Code Ann. § 40-35-303(d) (1997); State v. Burdin, 924 S.W.2d 82, 85 (Tenn. 1996); Stiller v. State, 516 S.W.2d 617, 620 (Tenn. 1974). In essence, it may "impose any terms and conditions not inconsistent with the Tennessee Sentencing Reform Act." State v. Johnson, 980 S.W.2d 410, 413 (Tenn. Crim. App. 1998) (citing State v. Huff, 760 S.W.2d 633, 639 (Tenn. Crim. App. 1988)). The primary goal of probation is the rehabilitation of the defendant. Burdin, 924 S.W.2d at 85. Thus, the conditions imposed by the trial court should be reasonably related to the defendant's rehabilitation, and should not be "so stringent as to be harsh, oppressive or palpably unjust." Stiller, 516 S.W.2d at 620. We review this issue de novo "'with a presumption that the determinations made by the court from which the appeal is taken are correct.'" Burdin, 924 S.W.2d at 84 (quoting Tenn. Code Ann. § 40-35-401). This presumption is applied "upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991).

---

[5]The trial court found that the defendant's monthly expenses averaged $829, while her pretax, biweekly pay, without overtime, was only $490, which left her with an excess of only $161 per month to pay additional expenses. We note that the trial court obviously made some errors in multiplication and arithmetic, since 80 hours multiplied by $6.25 per hour equals $500 in pretax, biweekly income, and $829 from $980, the pretax monthly income arrived at by the trial court, leaves $151. Regardless of which figures are used, the end result remains that the defendant's stated expenses take up most, if not all, of her after-tax, monthly income.

-4-

## B. Discussion

At the hearing, the trial court questioned the defendant in detail about her income and expenses:

MS. HUSKINS: All right. Does the Court have any more questions?

THE COURT: I have a couple. Ma'am, given the figures you've given to me, you told me that your bills run eight hundred and twenty-nine dollars ($829.00) a month. That's – that's averaging some things out. Eight hundred and twenty-nine dollars ($829.00) a month is what I show. If you tell me that you clear five hundred and twenty-five dollars ($525.00) a week, you're not telling me the truth, ma'am, every two weeks. Eighty dollars ($80.00) (?) at six twenty-five (6.25) an hour is four hundred and ninety dollars ($490.00) and that's without taking out anything. There is no way that you clear – do you have a pay stub with you?

MS. MATHES: No, I don't.

THE COURT: Ma'am, you knew what this hearing was about today, didn't you? Why didn't you bring me a pay stub to show me what you're making? You can't make. . .

MS. MATHES: Well, I don't even have my purse with me.

THE COURT: Well, I mean, you knew what – you knew what all kind of proof you're going to put on. Why didn't you bring me some proof down here? All you all just give me, just figures out of the air, possibly this or possibly that or a bill being paid here or there. What this Court finds is that you make, without any overtime, four hundred and ninety dollars every two weeks, or for a month – we're using – I'm just using that thirty (30) day figure – you make nine hundred and eighty dollars ($980.00) and that's before taxes. And ma'am, you can't make four hundred and ninety dollars ($490.00) a week and clear five hundred and twenty-five (525). The Court questions your credibility on this witness stand because of that. Using those figures of nine eighty (980), this Court finds that you've got a total, using your figures – and there's no proof in this record he helps you with anything other than what you've told me. And you don't tell me – you haven't told me what he helps you with or anything else. The Court also notes he's not here. One – it leaves you one hundred and sixty-one dollars ($161.00) a month, according to the figures you've given me, to live on outside of those expenses. I'm assuming that

-5-

with that child in school, you have some – do you have lunches out there you've got to pay for?

MS. MATHES: He gets free lunch.

THE COURT: You – you pay for his supplies?

MS. MATHES: Yes, I do.

THE COURT: What about his clothing? You've got to buy him clothing, don't you?

MS. MATHES: Yes, I do.

THE COURT: So that – those figures are figures you don't even have here, aren't they?

MS. MATHES: But my mom buys him clothing. My aunt buys him clothing.

THE COURT: So everybody has to buy him clothing, don't they?

MS. MATHES: No, they don't have to. They do it because that's what they want to do.

The defendant testified that her biweekly take-home pay ranged from $435 to $525. However, she failed to bring any documentation to support her claim of having the opportunity to work more than eighty hours in a two-week pay period, or to indicate to the trial court how often she is able to earn overtime. Moreover, when testifying as to her daily work schedule, she indicated that she worked only eight hours per day. Assuming, therefore, that $435 represents her regular take-home pay, she earns only $870 per month, while her stated expenses, which do not even include the costs of clothing or a telephone, average $829 per month. Thus, without some additional income, it is obvious that the defendant's $75 monthly payment will cause her monthly bills to exceed her monthly income, thereby compromising her care of her children. With regard to the defendant's claim that her daughter's father already helps her pay some of her bills, the trial court observed that although the defendant knew that she was to appear in court, all that she provided in the way of proof of this claim was "just figures out of the air, possibly this or possibly that or a bill being paid here or there." The trial court also noted the father's failure to appear in court to corroborate the defendant's claim. The court then issued its ruling, ordering legitimation only as to the younger child, so that the defendant could obtain child support payments and satisfy her financial obligations to the victim:

First of all, I'm going to reduce – the jury recommended a fine of four thousand dollars ($4,000.00) in this case. I'm going to reduce

that to five hundred dollars ($500.00), not reduce it, but the Court's going to set it at five hundred dollars ($500.00). She's going to have costs, restitution in the amount of five hundred dollars ($500.00) – one thousand one hundred and eighty-seven dollars and forty cents ($1,187.40) on the restitution which means again she takes away from her children to pay these fees. And that's what the issue's about in this Court. We have an eight (8) year old child that's illegitimate. We have an eight (8) year old child that's illegitimate that doesn't have a father, who has no obligation to this child whatsoever. That means he could win the lottery tomorrow, get killed the next day, and this young child gets nothing. That statute's there in place and this Court has, in my opinion, an obligation to see when people like [the defendant] comes [sic] before this Court that chooses to let some father of his child skip his responsibility, it's not responsible. It's not responsible. It's immaterial what her feeling is and what she wants to do, for whatever reason she has, the father of this child. What's important is the child – that the child have a father. And the child receives support from a lady who is doing everything that she can to support these children. She's got a good job. Her expenses take up everything she's got, and I've got to at least set the restitution and the court costs at – at least close to a hundred dollars ($100.00) a month, somewhere in there. So what I do by doing that is I take away from that child, both of those children. I take away possibly food from their mouths or some clothes for [sic] their back or some school supplies or a trip to a park or things like that. And that's not fair. It's not fair for her to not put the responsibility on the father of these children like it should be. It's her obligation. It's part of being on probation that you're productive and you're a good citizen. Being a good citizen is doing the right things for her children under that statute. Therefore, the Court – I'm not going to order it on the oldest child, that is the eight (8) year old child. The reason for that is because I don't think that it's logical to do that with him in a federal penitentiary. I've got to weigh, I guess, something in that regard. I'm going to – to back off on that one. Even if – if – even if he was there and I ordered it, the possibility of getting it done is not there. The problem is even with that eight (8) year old, he ends up being an illegitimate child, and that's not fair to him. It's not fair to him to be illegitimate. It's not fair to the eight (8) [sic] month old to be illegitimate. Especially it's not fair to be illegitimate and a father shirk that responsibility simply because the mother's not willing to enforce the right. Therefore, I'm going to order her to legitimate that eight (8) [sic] month old child. She will go to child support to do that where it's no cost to her, to where an appropriate amount of child support can be ordered for that eight (8) [sic] month old. I'm not

going to do anything with the eight (8) year old at this point. I'm going to hold that part in abeyance. If I leave her on for three (3) years, thirty-six (36) months, if I set it at fifty dollars ($50.00) a month, she can't meet the obligation. I'm going to have to set it at least – have you got any idea what the cost would be? I'm going to – I'm going to do everything I can for her. I'm going to waive her probation fees. I'm going to waive her probation fees. That's going to give her some relief. But she's got an obligation because of the injuries sustained to this young lady, and restitution is going to be ordered at one thousand one hundred and eighty-seven dollars and thirty cents ($1,187.30). The fine recommended by the jury in the amount of four thousand dollars ($4,000.00) is reduced to five hundred (500). That still yet leaves sixteen eighty-seven (1687) plus the costs. If I set it at fifty dollars ($50.00) a month, she can't meet the responsibility in the three (3) years I've got her on. If she was receiving child support to pay for those things such as rent, help with the food and those sorts of things, she wouldn't be in this position. I'm going to set the restitution, court costs and fine all at seventy-five dollars ($75.00) per month beginning the first of April. That one hundred dollars ($100.00) will be toward everything. I know you're going to appeal this, Ms. Huskins, and that's fine. I have no problem with that. She needs to go ahead and go on probation. There's no need for a delay on that if the only issue is whether that – that's going to be part of it. Anything else that needs to be put in the record in this case? I'm not going to pass on the eight (8) year old at this point. I'm going to check – have somebody to check the situation in Harrisburg on Mr. Jackson to see where he is on that sentence, and we'll go from there.

Thus, following his review of the defendant's income and expenses, the trial court set the fine at $500, rather than $4000, and started monthly payments for the fine, restitution, and court costs at $75, determining that the defendant needed to receive child support payments to pay even this reduced amount on a monthly basis. In her appeal, however, the defendant views the trial court's economic analysis as if it were intended solely to determine whether she is able to support her children without seeking child support payments. Without acknowledging the determination by the trial court as to her difficulty in both meeting monthly expenses and making restitution payments, the defendant poses the issue herein as being only whether the trial court's legitimation requirement violates her right to privacy and is an unreasonable condition of probation. We will consider these arguments, but in light of the restitution requirement.

### 1. Legitimization as Violative of the Defendant's Right to Privacy

Article I, Section 8, of the Tennessee Constitution, which is the basis for the defendant's privacy claims, provides as follows:

**Deprivation of life, liberty or property under law; due process.**

> That no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land.

In <u>Hawk v. Hawk</u>, 855 S.W.2d 573, 579 (Tenn. 1993), cited by both the defendant and the State, our supreme court recognized that the Tennessee Constitution grants parents a fundamental privacy interest, "ground[ed] in the concept of liberty," to rear their children "without unwarranted state intervention." <u>Id.</u> The specific issue addressed in <u>Hawk</u> was the constitutionality of the Grandparents' Visitation Act as "it applies to married parents whose fitness as parents is unchallenged." <u>Id.</u> at 577. After reviewing federal cases holding that the Fourteenth Amendment to the United States Constitution grants parents a fundamental liberty interest to autonomy in the rearing of their children, the court concluded that "parental rights constitute a fundamental liberty interest under Article I, Section 8 of the Tennessee Constitution." <u>Id.</u> at 579 (footnote omitted). Thus, with regard to the trial court's order granting visitation to the paternal grandparents over the wishes of the parents,[6] the court held that the Tennessee Constitution

> protects the privacy interest of these parents in their child-rearing decisions, so long as their decisions do not substantially endanger the welfare of their children. Absent some harm to the child, we find that the state lacks a sufficiently compelling justification for interfering with this fundamental right. When applied to married parents who have maintained continuous custody of their children and have acted as fit parents, we conclude that court interference pursuant to T.C.A. § 36-6-301 constitutes an unconstitutional invasion of privacy rights under the Tennessee Constitution.

<u>Id.</u> at 582.

Finally, the court in <u>Hawk</u> explained the trial court's error in ordering grandparent visitation:

> Reflecting on his own relationship with his grandparents, the trial judge insisted that he, too, would sue for visitation rights if his children denied him access to his grandchildren. Giving lip service to "the natural parents' prerogative to . . . raise their children in the

---

[6]In <u>Nale v. Robertson</u>, 871 S.W.2d 674 (Tenn. 1994), our supreme court made it clear that the constitutional right to privacy in parenting applies to unmarried, as well as married, parents: "Parents, including parents of children born out of wedlock, have a fundamental liberty interest in the care and custody of their children under both the United States and Tennessee Constitutions." <u>Id.</u> at 678 (citations omitted). The court went on to state, however, that "this right is not absolute and the State may interfere with parental rights if there is a compelling State interest." <u>Id.</u> (citations omitted).

manner in which they feel is best," he nevertheless established extensive visitation with the grandparents against the wishes of the parents. Without finding that the parents were unfit or that a dissolving marriage between the parents had brought the matter of child custody before the court, the court imposed its own notion of the children's best interests over the shared opinion of these parents, stripping them of their right to control in parenting decisions.

Id.

Based upon the decision in Hawk, the defendant contends that the trial court's order requiring legitimation of her younger child unconstitutionally infringes upon her right to privacy in the rearing of her daughter. She asserts that the record in this case fails to demonstrate that her decision not to legitimate her children will result in harm to either child, and that in the absence of such a showing, the trial court's order that she legitimate her daughter as a condition of her probation usurps her right, under the Tennessee and United States Constitutions, to rear her child as she sees fit. The State agrees with the defendant.

The family situation of the instant case is substantially unlike that which Hawk protected from state interference: "We find, however, that without a substantial danger of harm to the child, a court may not constitutionally impose its own subjective notions of the 'best interests of the child' when an intact, nuclear family with fit, married parents is involved." Id. at 579. This matter does not involve an "intact, nuclear family with fit, married parents." Rather, it is that of a single mother who, with two illegitimate children and a spotty employment record in near minimum wage jobs, would not be able to both support herself and her family and make restitution to the victim of her assault. Another fundamental difference between Hawk and the instant matter is the fact that the alleged intrusion upon the defendant's right to privacy results from the fact that she was convicted of a felony. Thus, we conclude that the holding in Hawk cannot be applied to the instant matter.

The law is clear that even though a condition of probation may limit a defendant's rights, it may be appropriate nonetheless. United States v. Peete, 919 F.2d 1168, 1181 (6th Cir. 1990) ("Probation restrictions may affect fundamental rights such as freedom of speech and freedom of association if the conditions are primarily designed to meet the ends of rehabilitation and protect the public."); Commonwealth v. LaPointe, 759 N.E.2d 294, 298 (Mass. 2001) ("A probation condition is enforceable, even if it infringes on a defendant's ability to exercise constitutionally protected rights, so long as the condition is 'reasonably related' to the goals of sentencing and probation."); Purdy v. State, 708 N.E.2d 20, 23 (Ind. Ct. App. 1999) ("[T]hose impingements [of a probationer's constitutionally protected rights] must be designed to accomplish the explicit goals of protecting the community and promoting the probationer's rehabilitation process."). The legitimacy of probation conditions is a fact dependent inquiry. State v. King, 692 A.2d 1384, 1385 (Me. 1997) ("The propriety of any given probation condition depends heavily on the facts of the case before the court."). There are numerous and varied examples of this principle being applied: LaPointe, 759 N.E.2d at 300 (it was not cruel and unusual punishment that the defendant, as a condition of probation, be prohibited from residing with his minor children and any future children he may have);

Moody v. State, 551 S.E.2d 772, 772 (Ga. Ct. App. 2001) (the defendant's privacy rights were not violated by a probation condition that he have "no further direct contact" with his wife, who was the victim in his three battery convictions); Trammell v. State, 751 N.E.2d 283, 288 (Ind. Ct. App. 2001) (no rehabilitative purpose was served by requiring that the defendant not become pregnant during her probation, following a conviction for neglect of her infant son, resulting in his death); and State v. Cameron, 916 P.2d 1183, 1186 (Ariz. Ct. App. 1996) (a defendant's constitutional right to travel was not violated by a state statute imposing a lifetime registration requirement for even misdemeanor sex offenders).

Thus, in appropriate cases, the rights of a defendant may be trumped by a condition of probation. Assuming for the purpose of completing our inquiry, that the legitimation requirement, to some extent, infringes upon the defendant's privacy right, we will examine the basis for a trial court's ordering payment of restitution as a condition of probation.

### 2. Legitimation of a Defendant's Child as a Condition of Probation

The defendant cites State v. Burdin, 924 S.W.2d 82 (Tenn. 1996), to argue that the trial court's legitimation requirement is unrelated to her rehabilitation and unauthorized by the probation statute. The probation condition challenged in Burdin was a requirement that the defendant, who had pled guilty to sexual battery of a sixteen-year-old, place a sign in his front yard warning neighborhood parents and children that he was a convicted child molester. Id. at 84. On appeal to the supreme court, the State argued that the requirement was permissible under the probation statute's general catch-all category, which provides that an offender may be required to "[s]atisfy any other conditions reasonably related to the purpose of the offender's sentence[.]" Id. at 85 (quoting Tenn. Code Ann. § 40-35-303(d)(9) (Supp. 1995)). The court rejected the argument, concluding that the primary goal of probation, as evidenced by the 1989 Sentencing Act and case law, is rehabilitation, and that nothing in the probation statute either expressly or implicitly allows "'breathtaking' departures from conventional principles of probation." Id. at 86. Finding that the sign requirement went "beyond the bounds of traditional notions of rehabilitation," the court affirmed this court's removal of the condition, and remanded the case to the trial court for the imposition of appropriate conditions of probation. Id. at 87.

We note first instances where this court has considered similar complaints as to conditions of probation. In State v. Robert Lewis Herrin, No. M1999-00856-CCA-R3-CD, 2001 Tenn. Crim. App. LEXIS 118, at *14-15 (Tenn. Crim. App., Nashville, Feb. 9, 2001), this court upheld the imposition of a narrowed version of a probation condition that restricted the ability of the defendant, who was a contractor convicted of soliciting payment for home repairs which were never done, from soliciting construction work, or even engaging in the trade, without satisfying certain conditions. Similarly, in State v. D'Shannon H. Goins, No. 03C01-9704-CR-00154, 1998 Tenn. Crim. App. LEXIS 931, at *13-15 (Tenn. Crim. App., Knoxville, Sept. 10, 1998), we held that probation conditions were overly broad and unenforceable which prohibited a defendant, convicted of simple assault, from entering any establishment selling alcoholic beverages and from living with a woman to whom he was not married. Prior to our supreme court's opinion in Burdin, we held in State v. Dowdy, 894 S.W.2d 301, 306 (Tenn. Crim. App. 1994), that a probation condition which required

that the defendant "participate in undercover police activities" was beyond the scope of the Sentencing Act and unduly restricted the defendant's liberty.

The defendant argues that the condition imposed by the trial court in her case represents a "breathtaking departure," similar to that in Burdin, from traditional notions of rehabilitation. She further contends that even if the condition is authorized by the statute, the record shows that she is already meeting her responsibilities to her children with minimal government assistance, and without the necessity of being forced to legitimate her child.

In assessing the enforceability of the objected-to condition of probation, we will review first the applicable statutory authorities regarding restitution. Tennessee Code Annotated Section 40-35-102, setting out the purposes of the Criminal Sentencing Reform Act of 1989, explains the desirable function of restitution in resolving criminal matters:

> (3) Punishment shall be imposed to prevent crime and promote respect for the law by:
>
>> (A) Providing an effective general deterrent to those likely to violate the criminal laws of this state;
>>
>> (B) Restraining defendants with a lengthy history of criminal conduct;
>>
>> (C) Encouraging effective rehabilitation of those defendants, where reasonably feasible, by promoting the use of alternative sentencing and correctional programs that elicit voluntary cooperation of defendants; and
>>
>> (D) Encouraging restitution to victims where appropriate[.]

Tenn. Code Ann. § 40-35-102(3)(A)–(D) (1997).

The Sentencing Commission Comments to this subdivision also encourage the use of restitution in sentencing: "Subdivision (3) is similar to prior law but adds restitution as an additional factor. The commission believes restitution should be ordered in all appropriate cases." Tenn. Code Ann. § 40-35-102, Sentencing Commission Cmts.

Sentencing alternatives, as set out in Tennessee Code Annotated Section 40-35-303(d), authorize the payment of restitution as a condition of probation:

> Whenever a court sentences an offender to supervised probation, the court shall specify the terms of the supervision and

-12-

may require the offender to comply with certain conditions which may include, but are not limited to:

(1) Meet the offender's family responsibilities;

(2) Devote the offender to a specific employment or occupation;

(3) Perform without compensation services in the community for charitable or governmental agencies;

(4) Undergo available medical or psychiatric treatment, and enter and remain in a specified institution whenever required for that purpose by voluntary self-admission to the institution pursuant to § 33-6-101;

(5) Pursue a prescribed secular course of study or vocational training;

(6) Refrain from possessing a firearm or other dangerous weapon;

(7) Remain within prescribed geographical boundaries and notify the court or the probation officer of any change in the offender's address or employment;

(8) Submit to supervision by an appropriate agency or person, and report as directed by the court;

(9) Satisfy any other conditions reasonably related to the purpose of the offender's sentence and not unduly restrictive of the offender's liberty, or incompatible with the offender's freedom of conscience, or otherwise prohibited by this chapter; or

(10) Make appropriate and reasonable restitution to the victim or the family of the victim involved pursuant to § 40-35-304.

Tenn. Code Ann. § 40-35-303(d) (1997).

The Sentencing Commission Comments to Tennessee Code Annotated Section 40-35-304 establish that it is the public policy of this state for the defendant to recompense the victim of the crime:

> This provision is similar to prior law and sets forth procedural aspects of restitution where imposed as a condition of probation. As provided in § 40-35-103(6), trial judges are encouraged to impose restitution in appropriate instances. The commission believes restitution to victims is an important part of public policy and these sections are intended to enhance that policy.

Tenn. Code Ann. § 40-35-304, Sentencing Commission Cmts. (1997).

Thus, a basic principle of the 1989 Criminal Sentencing Reform Act is that the defendant recompense the victim for losses resulting from the crime.

The record supports the trial court's determination that, given her economic needs, the defendant will have extreme difficulty making monthly payments for restitution, fine, and court costs. According to the presentence report, the defendant said that she graduated from high school in 1994. The only employment which she listed was as a dietary aide at the Appalachian Christian Village from August 1998 through December 1998; a temporary position at Godon's Furniture from February 1999 through June 1999; and as a dietary aide at Lakebridge Health Care Center from August 1999 until September 1999. She said that she had left that employment because of her arrest on the charge which resulted in this appeal. All of these jobs appeared to pay at, or near, the minimum wage. Additionally, she said that she had worked part-time at Infinities Urban Wear, a family-owned business. In the presentence report, the defendant's only asset was reported to be $234 in food stamps, while the uniform affidavit of indigency stated that she had no assets. According to that form, she did not file tax returns, presumably because of her low income. By any view of the defendant's reporting of her income and expenses, she is existing on a razor-thin edge, relying upon relatives to buy her children's clothes and her daughter's father paying certain bills, although under no court order to do so.

In view of the fact that the father of the defendant's younger child was on a month-long sojourn to Spain at the time of the hearing when, presumably, she could have been imprisoned, we believe that she takes an optimistic view of the father's support. Although the defendant testified that she "tell[s] him whatever bill is due" and he then "gives" her half of it, she did not reveal how long this informal and unenforceable arrangement had existed or how much, per month, she received from the father.

Given the mathematical doubt of the defendant's ability to complete restitution payments, the trial court's requirement that she take the necessary steps to ensure child support from her daughter's father is consistent with the goals of her rehabilitation. The Burdin court observed that the enumerated conditions of the probation statute "are closely related to conventional societal duties[,]" among which is an offender's obligations for "family support." 924 S.W.2d at 85. Here,

the trial court made findings of fact, supported by the record, that the costs occasioned by the defendant's criminal activity would render her unable to meet her family responsibilities without regular support from her daughter's father. The trial court further found that the defendant had failed to prove that her daughter's father provided regular support of his child. Under these circumstances, we cannot find that the trial court abused its broad discretion to set conditions of probation by ordering that the defendant legitimate her daughter.

We also find no merit in the defendant's contention that the record shows that the trial court found "the notion of a single mother with an illegitimate child to be morally repugnant," and imposed the requirement of legitimization of her child as "befitting its moral standard as relates to the traditional family unit."[7] If that were the case, we presume that the trial court would have ordered legitimation as to both children, and not just as to the one whose father had the apparent means to make support payments. Additionally, this argument utterly ignores the trial court's detailed analysis of the defendant's income and expenses to ascertain whether she could both support herself and her children and pay restitution.

By committing her crime against the victim, the defendant subjected herself to additional expenses. In the absence of regular support from her daughter's father, these additional expenses will almost certainly force her either to seek further government assistance, to compromise her children's care, or to cease paying restitution to the victim, who sustained facial scars, medical expenses, and lost wages because of the defendant's crime. Even under the payment schedule imposed by the trial court, the restitution payments, at no interest, will stretch over a period of several years. Thus, we conclude that to whatever extent the trial court's order that the defendant legitimate her younger child may violate her right to privacy, the requirement that she do so to ensure payment of restitution to the victim is clearly related to the defendant's crime and the principles of the Criminal Sentencing Reform Act of 1989. However, since a judgment of conviction is not to be entered when the defendant is granted judicial diversion, we remand for the trial court to clarify whether the defendant is to be sentenced, with the sentence suspended, or to be granted judicial diversion.

## CONCLUSION

---

[7] In her brief, the defendant claims that "[i]t is also clear that [the trial court] normally refers to children born out of wedlock in this context as 'bastards,' but because appellant's counsel objected to the use of this disparaging word, he did not use it on this occasion." The trial court said that it was "going to use the statute," without identifying the statute to which it referred. Apparently, contained within that statute was a word, also not identified, which was "not one of the court's favorite words." Trial defense counsel then advised the court, in the section set out in the defense brief, that she "personally object[ed] to that word," which continued to be unspoken. Thus, the record is ambiguous as to whether the unspoken "word" was "bastard." Additionally, the record is silent as to whether the trial court "normally" uses the word "bastard" in referring to illegitimate children, as the defendant claims is the case. We note that "bastard" is defined as "[a]n illegitimate child; a child born before the lawful marriage of its parents, *i.e.* born out of lawful wedlock," Black's Law Dictionary 138 (5th ed. 1979), and that the word "bastardy" is found in Tennessee Code Annotated Sections 8-21-701, 16-16-114, and 40-4-101. Thus, "bastard" is a term of legal significance although, by modern usage, it is also pejorative.

Based on the foregoing reasoning and authorities, we affirm the judgment of the trial court and remand the matter for proceedings consistent with this opinion.

_____
ALAN E. GLENN, JUDGE